UNITED STATES BANKRUPTCY COURT
DISTRICT OF WESTERN MASSACHUSETTS

---

| | |
|---|---|
| IN RE:<br>Karina Beleno-Carney, | CHAPTER 13<br>CASE NO. 20-40723-CJP |
| Debtor | |

---

| | |
|---|---|
| Karina Beleno-Carney,<br><br>Plaintiff<br><br>v.<br><br>Nelnet, Educational Credit<br>Management Corporation,<br>Internal Revenue Service and<br>Massachusetts Department of Revenue,<br><br>Defendants | ADVERSARY PROCEEDING<br>NO. 20-4039-CJP |

---

**TRIAL MEMORANDUM OF THE DEFENDANT,**
**EDUCATIONAL CREDIT MANAGEMENT CORPORATION**

This memorandum is presented by the Defendant, Educational Credit Management Corporation ('ECMC"), in opposition to the complaint filed in this Court by Karina Beleno-Carney ("Debtor") seeking the discharge of her student loan on the basis of undue hardship pursuant to 11 U.S.C. § 523(a)(8). ECMC submits that the evidence that will be presented at trial, as well as the undisputed facts, establishes that the Debtor's repayment of her student loan will not impose an undue hardship on the Debtor. As the Debtor will be unable to prove the

requisite "undue hardship" required by 11 U.S.C. § 523(a)(8) the Debtor's student loan obligations must be found to be nondischargeable.

## STATEMENT OF FACTS

### A. Student loan indebtedness at issue.

The Debtor is indebted to ECMC on one federal consolidation student loan ("Student Loan"). See Debtor's affidavit for trial ("Affidavit"), paragraph 3 and ECMC trial exhibit D-1. ECMC's exhibit D-1 shows the balance of the Student Loan to be $203,532.88 as of March 29, 2022.

### B. Debtor's age and household.

The Debtor is 44 years old, married and has 3 children, ages 14, 10 and 3. See Affidavit, paragraphs 2, 4, 6, 9 and 40. The Debtor's 10-year-old son is Type 1 diabetic. See Affidavit, paragraph 52.

### C. Debtor's education.

In May 2000, the Debtor received a Bachelor of Arts degree from Wellesley College. See Debtor's trial exhibit 9. In May 2003, the Debtor received a Certificate of Study from Chengdu University of Traditional Chinese Medicine. *Id.* In May of 2005, the Debtor received a Masters of Acupuncture and Oriental Medicine from AOMA Graduate School of Integrative Medicine. *Id.* The Debtor also speaks fluently in Spanish. See Debtor's trial exhibit 8.

### D. Debtor's employment.

For 2014 thru 2017 the Debtor was self-employed and operated a business known as Life Gate Acupuncture. See Affidavit, paragraph 50. From January 2018 through February 2020 the Debtor was self-employed and operated a business known as Life Gate Holistic Living Center,

2

Inc. *Id.* The Debtor closed her business in February 2020. See Affidavit, paragraph 23. From March 1, 2020 thru March 14, 2020 the Debtor worked as an independent contractor and performed acupuncture at a business called Well Being Acupuncture Center. See Affidavit, paragraph 50. From March 14, 2020 thru August 15, 2021, the Debtor was unemployed due to Covid 19. See Affidavit, paragraph 21. Later in August 2021 the Debtor opened her own acupuncture business, called Groton Community Acupuncture, which she continues to operate through the present. See Affidavit, paragraph 50. In addition to her operating her own business, from September 2021 through the present the Debtor works as a part-time Program Supervisor and Acting teacher at Apollinaire Play Lab. *Id.* Additionally, at diverse times the Debtor has been able to work as an actor in a variety of plays. *Id.* and Debtor's trial exhibit 8.

### E. Debtor's household income.

For 2022 the Debtor expects to earn $8,000 and the Debtor expects her spouse to earn $72,000, so the Debtor expects total household annual income of $80,000.[1] See Affidavit, paragraph 62. That means the Debtor expects to have total gross monthly income of approximately $6,666.66. *Id.* Per the Debtor's trial exhibits, the Debtor and her spouse had total gross annual income of:  1) $66,029 for tax year 2020; 2) $55,491 for tax year 2019, and 3) $56,738 for tax year 2019. See Debtor's trial exhibits 56, 55 and 54.

### F. Debtor's expenses.

The Debtor sets forth that her average household expenses, including the operation of the Debtor's business, are approximately $5,056 per month. See Affidavit, paragraph 60.

### G. Debtor's federal right to pay her Student Loan.

---

1. It is well established that in an undue hardship proceeding the total household income from all sources is to be considered, not just the income of the debtor. In re Hicks 331 B.R. 18, 36-38 (Bankr.D.Mass.2005).

3

The United States Department of Education, William D. Ford Direct Repayment Loan Program ("Ford Program"), offers several repayment options for federal student loan borrowers. The Ford Program is set forth within the Code of Federal Regulations at 34 C.F.R. 685, sections 685.100 through 685.402.

Prior to filing bankruptcy the Debtor had exercised her federal rights and opted to make payments on her Student Loan through the Income Based Repayment Plan ("IBR"). See 34 CFR § 682.215 et seq. The Debtor submits that she began repayment through the IBR in August 2013 and that at the end of the 25-year repayment period the Student Loan will be cancelled. See Debtor's second amended complaint, paragraphs 46 thru 48.

### H.    Debtor's right to repay her Student Loan through the federal Revised Pay As You Earn Program.

Separate from the IBR, the Debtor also has the right to repay her Student Loan through the federal Revised Pay As You Earn Program ("REPAYE"). See 34 CFR § 684.209(c) et seq. Under REPAYE the amount of student loan debt is not a factor in determining the monthly payment amount. See 34 CFR § 684.209(c) et seq. REPAYE determines a borrower's monthly payment amount annually by using a formula that takes into account, in part, a borrower's federal adjusted gross income ("AGI"). *Id.* Under REPAYE the monthly payment is limited to 10% of the amount by which a borrower's AGI exceeds 150% of federal poverty guideline applicable to a borrower's family size. *Id.* That 10% is then divided by 12 to establish the monthly payment amount. *Id.* If a borrower earns less than 150% of the federal poverty guideline for a borrower's family size, then the payment would be $0 per month. *Id.* The payment is calculated annually so the payment can increase or decrease depending upon the borrower's AGI, family size and changes to the federal poverty guidelines. *Id.* If a borrower's

4

federal student loans are not in the Ford Program, then the borrower may consolidate her federal student loans into the Ford Program and choose to make payments through REPAYE.

The Debtor's Student Loan is not in the Ford Program, it is in the Federal Family Education Loan Program. If the Debtor opted to consolidate her Student Loan into the Ford Program and make payments through REPAYE then the loan would have a 25-year term. *Id.* If there is a loan balance remaining at the end of the term, then the remaining loan balance is forgiven. *Id.*

## ARGUMENT

I. **THE DEBTOR WILL NOT ESTABLISH AN UNDUE HARDSHIP.**

  A. **The Undue Hardship standard.**

The dischargeability of an educational loan is governed by 11 U.S.C. § 523(a)(8), which provides in relevant part:

> A discharge under ... this title does not discharge an individual debtor from any debt---
>
> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for--
>
> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>
> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>
> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.

5

The Debtor bears the burden of proving undue hardship by a preponderance of the evidence. See *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Smith v. Educ. Credit Mgmt. Corp. (In re Smith)*, 328 B.R. 605, 611 (BAP 1st Cir. 2005); and *Savage v. Educ. Credit Mgmt. Corp (In re Savage)*, 311 B.R. 835, 839 (BAP 1st Cir. 2004). The First Circuit Court of Appeals has noted that the hardship alleged must be attributable to truly exceptional circumstances, such as illness or the existence of an unusually large number of dependents. *T. I. Fed. Credit Union v. Delbonis*, 72 F.3d 921, 928 (1st Cir. 1995). The First Circuit Court has confirmed that the Debtor has a "formidable task" as Congress has decided that the continued viability of the student loan program takes precedence over the otherwise general fresh start purpose of the Bankruptcy Code. *Nash v. Connecticut Student Loan Foundation, et al (In re Nash)*, 446 F.3d 188, 191 (1st Cir. 2006).

**B.     The legal test to be employed in determining the existence of an undue hardship under 11 U.S.C. § 523(a)(8).**

There are currently two main tests that courts employ to assist in determining whether an undue hardship exists, the *Brunner* test and the totality of the circumstances test. *Nash*, 446 F.3d at 190-191.

To discharge student loans under *Brunner*, a debtor must show:

(1)   he cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loans;

(2)   additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for the student loans; and

(3)   he has made good faith efforts to repay the loans.

*Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987).

6

To discharge student loans under the totality of the circumstances test requires a court to consider "(1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and her dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case." *Stevenson v. Educ. Credit Mgmt. Corp.*, 463 B.R. 586, 593 (Bankr.D.Mass.2011) (citation omitted).

The First Circuit Bankruptcy Appellate Panel ("BAP 1st Cir.") adopted the totality of the circumstances test. *Bronsdon v. Ed. Credit Mgmt. Corp.*, 435 B.R. 791, 800 (BAP 1st Cir. 2010) (citation omitted). ECMC is aware that this Court has stated that it intends to employ the totality of the circumstances test herein. However, the First Circuit Court of Appeals has not yet formally adopted a particular test for determining undue hardship under 11 U.S.C. § 523(a)(8). The First Circuit Court reasoned that the analytical framework of the tests are alike, concluding that, "[w]e see no need in this case to pronounce our views of a preferred method of identifying a case of 'undue hardship' ... both [tests] require the debtor to demonstrate that her disability will prevent her from working for the foreseeable future." *Id.*

Opposite the decision by the BAP 1st Cir., nine of the ten Circuit Court of Appeals that have adopted a test for determining undue hardship, have explicitly adopted *Brunner* as the appropriate standard. The Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits each have determined that the *Brunner* test best addresses the factors to be considered in determining whether an undue hardship exists in student loan discharge proceedings.[2] This widespread adoption of *Brunner* did not happen accidentally or quickly.

---

2 *See Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 400 (4th Cir. 2005); *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382 (6th Cir. 2005); *Educ. Credit Mgmt. Corp. v. Polleys (In re Polleys)*, 356 F.3d 1302 (10th Cir. 2004); *Hemar Ins. Corp. of Am. v. Cox (In re Cox)*, 338 F.3d 1238, 1241 (11th Cir. 2003); *United States Dep't of Educ. v. Gerhardt (In re Gerhardt)*, 348 F.3d 89, 91 (5th Cir. 2003); *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1112 (9th Cir.

Rather, *Brunner's* adoption spanned twenty years from 1985 when the District Court for the Southern District of New York first articulated the *Brunner* test in *In re Brunner*, 46 B.R. at 756, to 2005 when the Sixth Circuit formally adopted *Brunner* in *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 385 (6th Cir. 2005).

The rationale for adopting *Brunner* is sound. The Third Circuit, echoing the extensive evaluation of the Seventh Circuit found, "*Brunner* is the most consistent with the scheme that Congress established in 1978" and concluded the "*Brunner* test is the most logical and workable of the established tests." *Pa. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 306 (3d Cir. 1995) (citing *In re Roberson*, 999 F.2d 1132 (7th Cir. 1993)).

Based on the aforesaid ECMC respectfully requests that this Court employ the *Brunner* test herein. However, ECMC believes that under any legal analysis employed by this Court the Debtor fails to establish the existence of an undue hardship under Section 523(a)(8).

## II. THE DEBTOR WILL NOT ESTABLISH BY A PREPONDERANCE OF THE EVIDENCE THAT AN UNDUE HARDSHIP EXISTS UNDER ANY LEGAL ANALYSIS.

### A. Present inability to pay is not sufficient grounds for discharging a student loan obligation.

The Debtor bears the burden of proving undue hardship by a preponderance of the evidence. *Smith*, at 328 B.R. at 611. Therefore, it is the Debtor's burden to show that she cannot earn more money in the future, and not ECMC's burden to show that she can. *Mallinckrodt v. Chem. Bank*, 274 B.R. 560, 567 (S.D. Fla. 2002). The District Court's comment in *In re Wessels*, 271 B.R. 313 (Bankr. W.D. Wis. 2002) is particularly helpful in this respect:

---

1998); *Pa. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 305 (3d Cir. 1995); *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993); *In re Brunner*, 831 F.2d at 395 (2d Cir. 1987).

> [Debtor] argues that [the student loan creditor] is engaging in fuzzy math, speculation and a distortion of the record when it argues that she could obtain a 40 hour a week job as a licensed practical nurse and that defendant never introduced any evidence or expert testimony to prove that 40 hour a week jobs exist in the area in which she lives. [Debtor] has it wrong. It is not the [student loan creditor's] burden to show that full-time jobs exist for which [debtor] would be qualified. It is [debtor's] burden to show that she is one of the very few persons whom Congress intended to exempt from the nearly universal requirement that student loan [borrowers] must pay back their guaranteed student loans in full.

*Id.* at 315.

Current unemployment or underemployment is insufficient per se to establish undue hardship. *Paul v. Suffolk University, et. al. (In re Paul)*, 337 B.R. 730, 737. Undue hardship is not established by a debtor showing that his past and present income are insufficient to pay his student loans, without also proving that the debtor's prospects for increasing his future income are so dim as to warrant a discharge of his student loans. *Smith*, 328 B.R. at 609, and *Savage*, 311 B.R. at 839-840.

### i.   *The Debtor is capable of maintaining employment.*

The Debtor's work history establishes that it may reasonably be found that the Debtor is presently, and in the foreseeable future, capable of maintaining employment. It is true that having 3 children, one being 3 years of age, may currently impact the Debtor's ability to work. Although the Debtor does at present operate her own business and is also able to work part-time. Given the Debtor's demonstrated ability to maintain employment, it is reasonable to conclude that the Debtor's circumstances will improve in the future as her children grow older. As noted by another Court, the burden is on the Debtor to demonstrate that his prospects for future income increases are so poor as to warrant a discharge of his Student Loans. *Paul*, 337 B.R. at 737. Based upon the likelihood of future improvement for the Debtor's finances her request for an undue hardship should be denied.

9

### *ii.  That the Debtor has a young son with certain physical issues does not militate a finding of undue hardship.*

In a decision citing two BAP decisions on point herein, Judge Bailey explained why raising a young child does not forever limit a debtor's ability to work:

> At present and over most of his minority, her [debtor] son will require her time and care and constitute a limitation on her ability to earn. Still, even now, he does not require all of her time, and depending on her child-care options, her need to care for him may not even rule out full-time employment. As her son grows older, however, she will have more freedom from child-care obligations and time to work; and he will eventually become independent, freeing up more of her income for loan repayment. Her child is thus not a permanent obstacle to work and repayment. See *In re Savage*, 311 B.R. 835 (1st Cir. BAP 2004) (reversing finding of undue hardship because, in part, longer work hours will become more practical as debtor's son grows older); *In re Smith*, 328 B.R. 605 (1st Cir. BAP 2005) (debtors not entitled to undue hardship determination despite having child with special medical needs that necessitate limited work hours).

*Sanborn v. Educ. Credit Mgmt. Corp.*, 431 B.R. 5, 11 (Bankr. Mass. 2010).

Looking to the 1st Cir. BAP's decision *In re Smith*, the debtors had a 5-year-old son who was born with a sensory integration disorder. *Smith*, 328 B.R. at 609. Due to certain developmental problems related to that disorder, the son required physical therapy, occupational therapy and speech therapy, which he received primarily through the local public school system where he attended kindergarten. *Id.* The son also had juvenile diabetes and required frequent monitoring and insulin shots. *Id.* The said issues of the son by themselves were not sufficient to support a finding of undue hardship and the BAP reversed the lower court to discharge the debt.

Based on the above, this Court should similarly find that the raising of a young child with certain physical issues does not mandate a finding of undue hardship.

### *iii.  The Debtor's advanced education increases her employment prospects.*

The Debtor has an excellent education and speaks fluently in English and Spanish. Given the Debtor's advanced education, this Court may reasonably find that the Debtor's

education will be a valuable financial resource to the Debtor throughout her life. This Court may further find that the Debtor's education will always provide the Debtor with an advantage in the job market and assist the Debtor in her career.

The Debtor's education provides an ongoing likelihood for improvement in the Debtor's future income and employment opportunities. Based upon that reasonable likelihood for improvement in the Debtor's circumstances the Debtor's request for an undue hardship should be denied.

### iv.    *The Debtor's age does not support a finding of undue hardship.*

ECMC expects the Debtor may try to argue that soon she will be too old to repay her Student Loan. That argument must fail as the Debtor is only 44 years old and there is no reason to think she will not be able to continue to work for years hereafter. ECMC submits that in these circumstances the Debtor's age is not an exceptional circumstance that would support a finding of undue hardship.

As aptly put by another Court when it denied a request for discharge sought by an unemployed 61-year-old debtor, "[t]he Court finds that, while the Debtor has presented substantial evidence of his lack of income and present inability to repay his student loans, as well as his unsuccessful attempts to find employment in his chosen field, he has nevertheless failed to satisfy the stringent burden under 11 U.S.C. § 523 (a)(8)." *Green v. Cornell University, et al*, Slip Copy, No. 05-1381, 2006 WL 2061494 (Bankr. D. Mass. July 24, 2006).

Similar to the findings in the *Green* case, this Court should find that the Debtor's age is not a proper basis for a finding of undue hardship.

### B. The Debtor has the right under federal law to repay her Student Loan through REPAYE.

ECMC does not believe that the outcome of the case at bar "turns" on the availability of REPAYE; since the Debtor will not carry her burden herein that her past, present and future prospects are so dim as to require a finding of undue hardship. *Smith*, 328 B.R. at 609; and *Savage*, 311 B.R. at 839-840. Nonetheless, ECMC submits that the Debtor's ability to consolidate her Student Loan in the Ford Program and then repay her Student Loan through REPAYE is relevant and probative as to determining whether the Debtor now or in the future: 1) has the ability to obtain a monthly payment that would allow her to repay the Student Loan without an undue hardship; 2) taken all reasonable measures to resolve her Student Loan such that the Debtor would be entitled to a finding of undue hardship; and 3) has acted in good faith in trying to resolve her Student Loan obligations. Moreover, REPAYE is relevant because that repayment option is provided to the Debtor by federal law. Respectfully, ECMC submits that the Debtor's rejection of REPAYE simply means that the Debtor does not want to make payments on her Student Loan or otherwise fulfill her Student loan obligations.[3]

#### i. Calculation of the REPAYE payment.

Under REPAYE the repayment amount is calculated as being 10% of a borrower's "discretionary income." See 34 CFR § 684.209(c) et seq. REPAYE defines "discretionary income" to be the difference between a borrower's federal AGI and 150% of the poverty guideline for the borrower's family size and state of residence. *Id.* The said 10% is then divided by twelve to determine the monthly repayment amount. *Id.* The amount of discretionary income

---

3. See also the amended decision of Judge Katz in adversarial proceeding 19-03003-EDK at docket #82. The amended decision was docketed on May 13, 2021. In that undue hardship decision Judge Katz, in part, examines REPAYE and federal student loan repayment. The decision is currently on appeal to the BAP.

under REPAYE is recalculated annually based upon the same factors, being AGI, family size, state of residence and the updated amounts for the federal poverty guidelines. See 34 CFR § 684.209(c) et seq.

The Debtor's combined AGI for tax year 2020 was of $65,682. See Debtor's trial exhibit 56. The federal poverty guidelines for a family of five in Massachusetts is $32,470. See Federal Register/Vol. 87, No. 14 / Friday January 21, 2022, pages 3315 - 3316, a copy of which is attached as Exhibit A. So the Debtor's current payment under REPAYE would be approximately $276.76, as follows:

| | |
|---|---|
| AGI: | $65,682 |
| Less 150% Poverty Guideline: | ($32,470) |
| Amount of AGI over the Poverty Guideline: | $33,212 |
| 10% discretionary amount of the amount over the Poverty Guideline: | $3,321.20 |
| Present monthly payment under REPAYE Plan: | $276.76 |

Thus, REPAYE takes into account the financial ability of the Debtor to make payments and will never require the Debtor to pay more than 10% of the difference between her AGI and 150 percent of the federal poverty guidelines for her family size. So, if in the future the Debtor did experience a reduction in her household AGI, then the correspondingly her REPAYE payment would be reduced. See 34 CFR § 684.209(c) et seq. The Debtor's repayment term through REPAYE would be a 25-year term. *Id.* If there is a loan balance remaining at the end of the term, then the remaining loan balance is forgiven. *Id.*

Under REPAYE the Debtor would not be required to annually file renewal applications. *Id.* Instead, she would authorize the IRS to annually notify REPAYE of her combined AGI. *Id.*

If the Debtor experienced a sudden reduction of household income in the future, she could submit a form to REPAYE to have her payment amount forthwith reduced, so she would not have to wait for the annually recalculation of her payment to a lower amount. *Id.*

### ii. Additional features to be obtained through REPAYE.

#### 1. *Deferments and forbearances are available to the Debtor by consolidating and paying through REPAYE.*

If the Debtor opted to consolidate her Student Loan and make payments through REPAYE, then the Debtor would have the ability, if needed, to obtain up to 3 years of deferments and an additional 1 year of forbearances on making loan payments. See 34 C.F.R. § 685.204 & § 685.205.

#### 2. *In the event the Debtor repays her Student Loan through REPAYE then in the future her estate will not have any liability as to repayment of the Student Loan.*

ECMC expects that the Debtor may argue that REPAYE is not a viable option as the Debtor believes that if she should pass away during repayment then her estate would be liable for the Student Loan. That contention is incorrect as under federal law all federal student loans are to be discharged upon the death of the borrower. See 34 C.F.R. § 685.212(a).

#### 3. *It is not reasonably foreseeable that the Debtor will experience an income tax liability if the then remaining Student Loan debt is canceled 25 years in the future.*

It is expected that the Debtor will argue that REPAYE is not a viable option because the Debtor believes that 25 years from now when the loan ends, she may have a tax liability on the balance of the student loan debt that would then be canceled. That argument presupposes that the Debtor never makes any significant payments on her Student Loan or does not later switch into any of the other repayment options available under the Ford Program whereby she could

14

fully pay off the Student Loan. But even if the Debtor remained in REPAYE for the full 25 years and her loan balance is canceled 25 years in the future, the Debtor's argument is still incorrect as under Section 108 of the Internal Revenue Code the amount of indebtedness discharged is not included in the Debtor's gross income to the extent that the Debtor is insolvent. See 26 U.S.C. § 108(a)(1)(B). For purposes of this section of the Internal Revenue Code, "the term "insolvent" means the excess of liabilities over the fair market value of <u>assets</u>." (emphasis added) 26 U.S.C. § 108(a)(1)(B)(3). Therefore with respect to any discharge, the amount by which the Debtor is insolvent shall be determined on the basis of the Debtor's then assets and liabilities immediately before the discharge occurs 25 years in the future.

In the case at bar the Debtor is alleging that she does not expect to have any substantial assets in the future. If the Debtor is correct, then as a matter of law she will not have a forgiveness of debt tax liability if the unpaid portion of her student loan debt is discharged after the 25-year duration of the IBR or REPAYE. But even if the Debtor is solvent 25 years in the future, then the tax liability would not be equal to the total amount of debt forgiven; rather the tax liability will be based on the Debtor's then income tax bracket/percentage in relation to the actual amount of debt that is forgiven. Moreover, the Debtor would still have options to resolve the liability such as making an offer in compromise. As noted by another court when it rejected the tax argument raised by a debtor, "[t]he Court finds this reasoning unpersuasive" concluding over the 25-year span the debtor could have repaid the debt, could be insolvent at the end of the payment period, or could enter into an offer in compromise program with the Internal Revenue Service." *Paul*, 337 B.R. at 737.

15

Further, the tax argument should be rejected as arguing what may occur 25 years in the future is extremely remote and speculative and does not impact the Debtor's present ability to repay the Student Loan.

### III. PARTIAL DISCHARGE OF A STUDENT LOAN IS WITHIN THE EQUITABLE POWERS GRANTED TO THE BANKRUPTCY COURT UNDER 11 U.S.C. § 105(A), BUT IT IS ONLY ALLOWABLE IF THE DEBTOR FIRST ESTABLISHES THE EXISTENCE OF AN UNDUE HARDSHIP.

Should this Court first find that an undue hardship exists herein, then ECMC requests that the Court thereafter examine the Student Loan and strike only the portion of the debt that the Court finds the repayment of which would constitute an undue hardship. ECMC submits that this Court has the authority to so modify the Student Loan, but only after first finding the existence of an undue hardship, pursuant to the court's general equity powers contained within § 105(a). See *In re Alderete*, 412 F.3d 1200 (10th Cir. 2005); *Miller v. Pa. Higher Educ. Assistance Agency (In re Miller)*, 377 F.3d 616, (6th Cir. 2004); *Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman)*, 325 F.3d 1168 (9th Cir. 2003); *In re Cox*, 338 F.3d 1238 (11th Cir. 2003).

### CONCLUSION

Congress has promoted the issuance of student loans by limiting the discharge of educational loans in bankruptcy to exceptional cases. The First Circuit Court of Appeals has recognized that a debtor has a "formidable task" in seeking a discharge of student loans, as Congress has decided that the continued viability of the student loan program takes precedence over the otherwise general fresh start purpose of the Bankruptcy Code. *Nash*, 446 F.3d at 191. As aptly noted by the 7th Circuit in denying a request for a student loan discharge, the decision whether or not to borrow for a college education lies with the borrower. *In Re Roberson*, 999 F.2d 1132, 1137 (7th Cir. 1993). The government does not guarantee the financial success of the

borrower. *Id.* If the leveraged investment of education does not generate the return the borrower hoped for, then the borrower, not the taxpayers, must accept the consequences of the decision to borrow. *Id.*

The Debtor herein will not establish an undue hardship under any undue hardship test. The Debtor is faced with no extraordinary circumstances justifying discharge of the debt. This Court should deny the Debtor the relief sought, determine that there will be no undue hardship caused to the Debtor by excepting the Student Loan from discharge, and enter judgment determining that the Student Loan is nondischargeable under 11 U.S.C. § 523(a)(8).

Respectfully submitted,
Educational Credit Management Corporation
Defendant, by its attorney,

/s/ John F. White
John F. White, Esq. BBO# 558367
jwhite@lipmanwhite.com
Lipman & White
171 Rockland Street, Ste. 201
Hanover, MA 02339
Tel. 781-924-5678
Dated: April 4, 2022

## CERTIFICATE OF SERVICE

I, John F. White, attorney for ECMC hereby certify that I have served a copy of this TRIAL MEMORANDUM on the below counsel on April 4, 2022.

/s/ John F. White
John F. White, Esq.

Via ECF and/or Email

Gary W. Cruickshank, Esq.
Law Office of Gary W. Cruickshank
21 Custom House Street, Suite 920
Boston, MA 02110
Email: gwc@cruickshank-law.com

17

# Exhibit A

detailed agenda and meeting registration link will be available on the NACCD meeting website *https://www.phe.gov/Preparedness/legal/boards/naccd/Pages/default.aspx.*

**ADDRESSES:** Members of the public may attend the meeting via a toll-free phone number or Zoom teleconference, which requires pre-registration. The meeting link to pre-register will be posted on *https://www.phe.gov/Preparedness/legal/boards/naccd/Pages/default.aspx.* Members of the public may provide written comments or submit questions for consideration by the NACCD at any time via email to *NACCD@hhs.gov.* Members of the public are also encouraged to provide comments after the meeting.

**FOR FURTHER INFORMATION CONTACT:** Zhoowan Jackson, NACCD Designated Federal Officer, Office of the Assistant Secretary for Preparedness and Response (ASPR), Department of Health and Human Services (HHS), Washington, DC; 202-205-4217, *NACCD@hhs.gov.*

**SUPPLEMENTARY INFORMATION:** The NACCD invites those who are involved in or represent a relevant industry, academia, health profession, health care consumer organization, or state, Tribal, territorial or local government to request up to four minutes to address the committee in person via Zoom. Requests to provide remarks to the NACCD during the public meeting must be sent to *NACCD@hhs.gov* at least 15 days prior to the meeting along with a brief description of the topic. We would specifically like to request inputs from the public on challenges, opportunities, and strategic priorities for national public health and medical preparedness, response and recovery specific to the needs of children and their families in disasters. Presenters who are selected for the public meeting will have audio only for up to four minutes during the meeting. Slides, documents, and other presentation material sent along with the request to speak will be provided to the committee members separately. Please indicate additionally whether the presenter will be willing to take questions from the committee members (at their discretion) immediately following their presentation (for up to four additional minutes).

**Dawn O'Connell,**

*Assistant Secretary for Preparedness and Response.*

[FR Doc. 2022-01161 Filed 1-20-22; 8:45 am]

**BILLING CODE 4150-37-P**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Office of the Secretary

### Annual Update of the HHS Poverty Guidelines

**AGENCY:** Department of Health and Human Services.

**ACTION:** Notice.

**SUMMARY:** This notice provides an update of the Department of Health and Human Services (HHS) poverty guidelines to account for last calendar year's increase in prices as measured by the Consumer Price Index.

**DATES:** January 12, 2022 unless an office administering a program using the guidelines specifies a different effective date for that particular program.

**ADDRESSES:** Office of the Assistant Secretary for Planning and Evaluation, Room 404E, Humphrey Building, Department of Health and Human Services, Washington, DC 20201.

**FOR FURTHER INFORMATION CONTACT:** For information about how the guidelines are used or how income is defined in a particular program, contact the Federal, state, or local office that is responsible for that program. For information about poverty figures for immigration forms, the Hill-Burton Uncompensated Services Program, and the number of people in poverty, use the specific telephone numbers and addresses given below.

For general questions about the poverty guidelines themselves, contact Kendall Swenson, Office of the Assistant Secretary for Planning and Evaluation, Room 404E.3, Humphrey Building, Department of Health and Human Services, Washington, DC 20201—telephone: (202) 795-7309—or visit *http://aspe.hhs.gov/poverty/.*

For information about the percentage multiple of the poverty guidelines to be used on immigration forms such as USCIS Form I-864, Affidavit of Support, contact U.S. Citizenship and Immigration Services at 1-800-375-5283. You also may visit *https://www.uscis.gov/i-864.*

For information about the Hill-Burton Uncompensated Services Program (free or reduced-fee health care services at certain hospitals and other facilities for persons meeting eligibility criteria involving the poverty guidelines), contact the Health Resources and Services Administration Information Center at 1-800-638-0742. You also may visit *https://www.hrsa.gov/get-health-care/affordable/hill-burton/index.html.*

For information about the number of people in poverty, visit the Poverty section of the Census Bureau's website at *https://www.census.gov/topics/income-poverty/poverty.html* or contact the Census Bureau's Customer Service Center at 1-800-923-8282 (toll-free) or visit *https://ask.census.gov* for further information.

**SUPPLEMENTARY INFORMATION:**

### Background

Section 673(2) of the Omnibus Budget Reconciliation Act (OBRA) of 1981 (42 U.S.C. 9902(2)) requires the Secretary of the Department of Health and Human Services to update the poverty guidelines at least annually, adjusting them on the basis of the Consumer Price Index for All Urban Consumers (CPI-U). The poverty guidelines are used as an eligibility criterion by Medicaid and a number of other Federal programs. The *poverty guidelines* issued here are a simplified version of the *poverty thresholds* that the Census Bureau uses to prepare its estimates of the number of individuals and families in poverty.

As required by law, this update is accomplished by increasing the latest published Census Bureau poverty thresholds by the relevant percentage change in the Consumer Price Index for All Urban Consumers (CPI-U). The guidelines in this 2022 notice reflect the 4.7 percent price increase between calendar years 2020 and 2021. After this inflation adjustment, the guidelines are rounded and adjusted to standardize the differences between family sizes. In rare circumstances, the rounding and standardizing adjustments in the formula result in small decreases in the poverty guidelines for some household sizes even when the inflation factor is not negative. In cases where the year-to-year change in inflation is not negative and the rounding and standardizing adjustments in the formula result in reductions to the guidelines from the previous year for some household sizes, the guidelines for the affected household sizes are fixed at the prior year's guidelines. As in prior years, these 2022 guidelines are roughly equal to the poverty thresholds for calendar year 2021, which the Census Bureau expects to publish in final form in September 2022.

The poverty guidelines continue to be derived from the Census Bureau's current official poverty thresholds; they are not derived from the Census Bureau's Supplemental Poverty Measure (SPM).

The following guideline figures represent annual income.

### 2022 POVERTY GUIDELINES FOR THE 48 CONTIGUOUS STATES AND THE DISTRICT OF COLUMBIA

| Persons in family/household | Poverty guideline |
|---|---|
| 1 | $13,590 |
| 2 | 18,310 |
| 3 | 23,030 |
| 4 | 27,750 |
| 5 | 32,470 |
| 6 | 37,190 |
| 7 | 41,910 |
| 8 | 46,630 |

For families/households with more than 8 persons, add $4,720 for each additional person.

### 2022 POVERTY GUIDELINES FOR ALASKA

| Persons in family/household | Poverty guideline |
|---|---|
| 1 | $16,990 |
| 2 | 22,890 |
| 3 | 28,790 |
| 4 | 34,690 |
| 5 | 40,590 |
| 6 | 46,490 |
| 7 | 52,390 |
| 8 | 58,290 |

For families/households with more than 8 persons, add $5,900 for each additional person.

### 2022 POVERTY GUIDELINES FOR HAWAII

| Persons in family/household | Poverty guideline |
|---|---|
| 1 | $15,630 |
| 2 | 21,060 |
| 3 | 26,490 |
| 4 | 31,920 |
| 5 | 37,350 |
| 6 | 42,780 |
| 7 | 48,210 |
| 8 | 53,640 |

For families/households with more than 8 persons, add $5,430 for each additional person.

Separate poverty guideline figures for Alaska and Hawaii reflect Office of Economic Opportunity administrative practice beginning in the 1966–1970 period. (Note that the Census Bureau poverty thresholds—the version of the poverty measure used for statistical purposes—have never had separate figures for Alaska and Hawaii.) The poverty guidelines are not defined for Puerto Rico or other outlying jurisdictions. In cases in which a Federal program using the poverty guidelines serves any of those jurisdictions, the Federal office that administers the program is generally responsible for deciding whether to use the contiguous-states-and-DC guidelines for those jurisdictions or to follow some other procedure.

Due to confusing legislative language dating back to 1972, the poverty guidelines sometimes have been mistakenly referred to as the "OMB" (Office of Management and Budget) poverty guidelines or poverty line. In fact, OMB has never issued the guidelines; the guidelines are issued each year by the Department of Health and Human Services. The poverty guidelines may be formally referenced as "the poverty guidelines updated periodically in the **Federal Register** by the U.S. Department of Health and Human Services under the authority of 42 U.S.C. 9902(2)."

Some federal programs use a percentage multiple of the guidelines (for example, 125 percent or 185 percent of the guidelines), as noted in relevant authorizing legislation or program regulations. Non-Federal organizations that use the poverty guidelines under their own authority in non-Federally-funded activities also may choose to use a percentage multiple of the guidelines.

The poverty guidelines do not make a distinction between farm and non-farm families, or between aged and non-aged units. (Only the Census Bureau poverty thresholds have separate figures for aged and non-aged one-person and two-person units.)

This notice does not provide definitions of such terms as "income" or "family" as there is considerable variation of these terms among programs that use the poverty guidelines. The legislation or regulations governing each program define these terms and determine how the program applies the poverty guidelines. In cases where legislation or regulations do not establish these definitions, the entity that administers or funds the program is responsible to define such terms as "income" and "family." Therefore, questions such as net or gross income, counted or excluded income, or household size should be directed to the entity that administers or funds the program.

Dated: January 18, 2022.

**Xavier Becerra,**
*Secretary, Department of Health and Human Services.*

[FR Doc. 2022–01166 Filed 1–20–22; 8:45 am]
**BILLING CODE 4150–05–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Meeting of the National Vaccine Advisory Committee

**AGENCY:** Office of Infectious Disease and HIV/AIDS Policy, Office of the Assistant Secretary for Health, Office of the Secretary, Department of Health and Human Services.

**ACTION:** Notice.

**SUMMARY:** As stipulated by the Federal Advisory Committee Act, the Department of Health and Human Services (HHS) is hereby giving notice that the National Vaccine Advisory Committee (NVAC) will hold a virtual meeting. The meeting will be open to the public and public comment will be heard during the meeting.

**DATES:** The meeting will be held February 10–11, 2022. The confirmed meeting times and agenda will be posted on the NVAC website at *http://www.hhs.gov/nvpo/nvac/meetings/index.html* as soon as they become available.

**ADDRESSES:** Instructions regarding attending this meeting will be posted online at: *http://www.hhs.gov/nvpo/nvac/meetings/index.html* at least one week prior to the meeting. Pre-registration is required for those who wish to attend the meeting or participate in public comment. Please register at *http://www.hhs.gov/nvpo/nvac/meetings/index.html.*

**FOR FURTHER INFORMATION CONTACT:** Ann Aikin, Acting Designated Federal Officer, at the Office of Infectious Disease and HIV/AIDS Policy, U.S. Department of Health and Human Services, Mary E. Switzer Building, Room L618, 330 C Street SW, Washington, DC 20024. Email: *nvac@hhs.gov.*

**SUPPLEMENTARY INFORMATION:** Pursuant to Section 2101 of the Public Health Service Act (42 U.S.C. 300aa–1), the Secretary of HHS was mandated to establish the National Vaccine Program to achieve optimal prevention of human infectious diseases through immunization and to achieve optimal prevention against adverse reactions to vaccines. The NVAC was established to provide advice and make recommendations to the Director of the National Vaccine Program on matters related to the Program's responsibilities. The Assistant Secretary for Health serves as Director of the National Vaccine Program.

The NVAC celebrates 35 years and will kick off the meeting reflecting on accomplishments and outling