**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) | Case No. 20-40723-CJP |
| KARINA BELENO CARNEY, | ) |  |
|  | ) |  |
| Debtor | ) |  |

_____

|  |  |  |
|---|---|---|
| KARINA BELENO CARNEY, | ) |  |
|  | ) |  |
| Plaintiff | ) | Adv. Pro. No. 20-4039-CJP |
| v. | ) |  |
|  | ) |  |
| EDUCATIONAL CREDIT | ) |  |
| MANAGEMENT CORPORATION, | ) |  |
| INTERNAL REVENUE SERVICE, AND | ) |  |
| MASSACHUSETTS DEPARTMENT OF | ) |  |
| REVENUE, | ) |  |
|  | ) |  |
| Defendants | ) |  |

_____

### MEMORANDUM OF DECISION

In the matter before the Court, the plaintiff, chapter 7 debtor Karina Beleno Carney (the "Debtor"),[1] seeks a determination under 11 U.S.C. § 523(a)(8)[2] that the student loan debt she owes to defendant Educational Credit Management Corporation ("ECMC") be discharged because excepting it from discharge would impose an undue hardship on her and her dependents. After a trial, the Court now enters the following findings of fact and conclusions of law and concludes that the Debtor has not met her burden of proving undue hardship.[3]

---

[1] The Debtor's petition and filings in her bankruptcy case reflect that her last name is not hyphenated, which conflicts with certain filings in this adversary proceeding. It appears that the Debtor may also be known as Karina Beleno-Carney.

[2] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code" or "Code").

[3] The following are the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this matter by Federal Rule of Bankruptcy Procedure 7052. To the extent any factual finding is deemed to be a conclusion of law, I adopt the same as such, and vice-versa.

This case illustrates the tension between the "fresh start" objectives of the Bankruptcy

Code and the legislative and administrative repayment objectives related to certain educational

loans.  As I will detail below, this Debtor appears to have no realistic possibility of repaying any

significant portion of her educational debt under her present circumstances, and making any

substantial monthly payments towards that debt would impose an undue hardship on her and her

dependents.  Because the Debtor has available to her, and she participates in, an income-based

repayment plan through the Department of Education requiring no payments or nominal

payments, the Debtor and her spouse are able to meet their living expenses without an unduly

burdensome educational loan payment.  The Debtor testified that she can make these nominal

payments under the terms of the repayment plan.  The Debtor focuses her undue hardship

argument on the possible burden of forgiveness of indebtedness income that may result in a tax if

and when her debt is forgiven at the end of her repayment plan.  This record does not include

sufficient evidence that the educational loan indebtedness, even if subject to taxation as

forgiveness of indebtedness income at the conclusion of an income-based repayment plan, will

impose an undue hardship as contemplated under § 523(a)(8).  Further, the Debtor did not

introduce any substantial evidence that payment of any amounts on account of the educational

loan will impose an undue burden on the Debtor or her dependents for any other reason, such as

because of an effect on the Debtor's credit, earning potential, or health.  In this case, the Debtor

has not met her burden to demonstrate that she will suffer adverse tax consequences many years

from now.  Some courts have determined that such a tax result is obvious enough to grant relief.

Other courts have held that the fact that the Department of Education has provided relief through

income-driven repayment plans should not mean that a debtor with no prospect of actual

repayment may not be relieved of the weight of educational debt and provided a fresh start

through a bankruptcy discharge.  While I might prefer one of these different results, I am

constrained by my interpretation of controlling law and the record of this case to conclude that

the Debtor has not met her burden under the standard imposed by § 523(a)(8).

## I.   PROCEDURAL HISTORY

On July 2, 2020, the Debtor filed a petition for relief under chapter 7 of the Bankruptcy

Code and received a discharge under § 727. She commenced the present adversary proceeding

to challenge the nondischargeability of her student loan debt. In her original complaint (the

"Complaint"), the Debtor requested a declaratory judgment against Nelnet and the defendant

taxing authorities, the Internal Revenue Service ("IRS" or "United States") and the

Massachusetts Department of Revenue ("MDOR") (together, the "Taxing Authorities"). She

alleged that: (i) she was indebted on certain student loans held by Nelnet; (ii) "since August 24,

2013[,]" she has been participating in the Department of Education's William D. Ford Program

(the "Ford Program") in connection with the repayment of these loans; (iii) upon her completion

of the payments required by and pursuant to the provisions of the Ford Program, she anticipated

that any balance then owing would be forgiven; and (iv) the expected forgiveness would

constitute debt-forgiveness income for which she would incur tax liability to the Taxing

Authorities. Based on these allegations, she requested, as against Nelnet and the Taxing

Authorities, "a finding that, upon completion of the payments by the Plaintiff under the Ford

Program, the remainder of the student loan debt is discharged so there will be no forgiveness of

debt income tax." Compl. 4.

The Debtor then amended the complaint to add College Assist as a defendant, stating that

she had learned that College Assist was the actual holder of the loans in question and that Nelnet

was merely the servicer of the loans (the "First Amended Complaint"). In response to the First

Amended Complaint, ECMC moved to be substituted for College Assist as a defendant, saying

that it soon would be the holder by assignment of the loans then held by College Assist.

Receiving no opposition, the Court granted the motion, and ECMC was thereby substituted for College Assist as a defendant. Additionally, the Taxing Authorities each moved to dismiss the First Amended Complaint, which sought entry of the same declaratory judgment as the Complaint, and the Court allowed their motions without prejudice to the Debtor filing a further amended complaint.

The Debtor filed a second amended complaint (the "Second Amended Complaint") against the Taxing Authorities and College Assist but not ECMC.[4] By virtue of the Court's earlier order allowing ECMC's motion to be substituted as a party, the Court nonetheless understands ECMC, not College Assist, to be the holder of the student loan debt that is the subject of this action and, as such, the loan-holder defendant in issue; College Assist is no longer a party. In the Second Amended Complaint, the Debtor seeks a determination under § 523(a)(8) and against ECMC that the student loan debt held by ECMC should be discharged because excepting that debt from discharge would impose on her and her dependents an undue hardship. The alleged undue hardships on which this request is founded include both the Debtor's present financial circumstances and the tax consequences of forgiveness of debt at the end of her repayment plan. The Debtor also requests, again under § 523(a)(8) and against ECMC, an order discharging any student loan debt that may remain upon her completion of the income-based repayment plan ("IBRP") in which she is enrolled under the Ford Program. Finally, she seeks a preemptive declaration against the Taxing Authorities that the discharge of her student loan indebtedness would not constitute taxable income arising from discharge of indebtedness.

The United States moved to dismiss the Second Amended Complaint, and the MDOR joined in that motion. After a hearing on the motion, the Court entered a stipulated order

---

[4] Around this time, the Debtor filed a notice of voluntary dismissal of Nelnet, which, therefore, is no longer a party to this proceeding.

submitted by the parties[5] phasing the resolution of this adversary proceeding so that the Court

will first determine the counts for discharge of the debt under § 523(a)(8) against ECMC,

following which the Court will establish further procedures to address the remaining demand for

relief against the Taxing Authorities, if necessary.

The Court conducted a trial with respect to the claims that the debt owed to ECMC

constitutes an undue hardship and should be discharged.  The Debtor's direct testimony was

submitted by affidavit and she was further examined and cross-examined at trial.  The only other

witness was the Debtor's spouse, Elena Beleno Carney ("Elena").  The parties then submitted

post-trial briefs incorporating proposed findings of fact and conclusions of law.[6]

## II.    JURISDICTION

Subject to exceptions not applicable here, the jurisdiction of the district courts over

bankruptcy cases and proceedings extends to "all civil proceedings arising under title 11, or

arising in or related to cases under title 11."  28 U.S.C. § 1334(b).  Actions to determine the

dischargeability of a debt arise in a bankruptcy case under Title 11.  *See, e.g.,* 11 U.S.C. §

523(a)(8).  They are, therefore, within the jurisdiction conferred on the district court by 28

U.S.C. § 1334(b) and, pursuant to 28 U.S.C. § 157(a), referred to the bankruptcy court by a

standing order of reference.  *See* L.R., D. Mass. 201.  Moreover, a proceeding to determine the

dischargeability of a debt is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1) and

[5] All remaining parties, the Debtor, the Taxing Authorities, and ECMC, stipulated and agreed to the order.

[6] The Court will refer to the post-trial briefs herein as the Debtor's Brief and ECMC's Brief, respectively. ECMC also submitted a trial brief on the eve of trial, which the Court will reference as ECMC's Pre-trial Brief.

On the same date both parties filed their post-trial briefs, the Debtor also filed an affidavit by Elena attesting to changes in her and the Debtor's circumstances that had developed since the trial.  The Court entered an order providing that, if the Debtor did not also move to reopen the evidence, the affidavit of changed circumstances may be stricken.  The Debtor withdrew the affidavit.  I have not considered the post-trial affidavit of Elena in determining the Second Amended Complaint.

(2). *See* 28 U.S.C. § 157(b)(2)(I) (core proceedings include "determinations as to the

dischargeability of particular debts"). Accordingly, I may finally determine the Debtor's §

523(a)(8) claims. *See id.* § 157(b)(1).

## III.    FINDINGS OF FACT

### a.   The Debtor and Her Family

1.      At the time of trial, the Debtor was 44 years old. She and Elena have been

married for fifteen years, and they have three minor children ranging in age from 3 to 14.

2.      Elena, the primary earner in the family, has been employed for ten years as a

faculty member at a private boarding school. Under the terms of Elena's employment, her

family lives rent free on campus.

3.      During the school year, which extends from Labor Day weekend to the second

week of June each year, Elena's duties at the school include, among other things, teaching during

the school day, coaching in some seasons for the remainder of the afternoon, and undertaking

certain residential hall responsibilities one night per week from 7:00 p.m. to 11:00 p.m. and on

some weekends. Elena also has summer duties, but these are generally much lighter than during

the school year.

4.      In their family, child-care duties fall mostly to the Debtor, who is the primary

caregiver. Elena also cares for the couple's children when her work schedule permits. For the

most part, however, Elena's work schedule is not flexible and affords her little ability while

working to respond to child-care emergencies. Accordingly, when Elena is occupied by her

duties at school, the responsibility for responding to child-care emergencies—such as when a

child becomes ill and needs to be picked up from school—falls on the Debtor. In view of the

extent of Elena's work duties during the school year and the fact that the children deal with

certain medical conditions, these circumstances presently restrict the extent of the Debtor's ability to work outside the home.

5.      In 2017, one of the couple's children was diagnosed with a medical condition, which the Debtor characterized as a temporary disability.  This condition required six weeks of full-day outpatient care in 2021.  The Debtor is primarily responsible for taking the child to medical appointments for their condition; these appointments include physical therapy and occupational therapy as recommended by their care team.  No evidence was adduced as to how many hours these appointments presently consume in an average week or month.

6.      In 2018, another of the couple's children was diagnosed with a medical condition as well, a permanent condition for which the child requires constant monitoring, several prescription drugs, and various medical appointments.  On account of this condition, their school requires that a parent be present when the child participates in certain school activities.

**b.  The Debtor's Education and Student Loans**

7.      The Debtor's education includes a four-year undergraduate program at Wellesley College, where she majored in anthropology and medicine and from which she received a Bachelor of Arts degree in June 2000.  The Debtor then went on to complete a graduate program at the AOMA Graduate School of Integrative Medicine in Austin, Texas, where she studied from June 2001 through May 2005 and for which she received a Master of Acupuncture and Oriental Medicine degree in 2005.  She also completed a two-month program at Chengdu University of Traditional Chinese Medicine in Chengdu, China in February and March 2003.

8.      The Debtor graduated from her undergraduate program with approximately $25,000 in student loans.  She incurred additional student loan debt to finance her graduate studies.  At the time of trial, the Debtor testified she is indebted to ECMC in the approximate amount of $200,164.49 on account of various student loans that were consolidated into a federal

consolidation loan.  The record includes no specific accounting of how her student loan debt

grew to its present size, but there is no dispute that the Debtor owes more than $200,000 and that

the consolidation loan has a fixed interest rate of 5.375%.[7]

### c.  The Debtor's History of Employment and Earnings

9.      The Debtor completed her graduate program in 2005.  She provided little

evidence of her employment and earnings from 2005 until 2014.

10.     From 2014 until April 2017, the Debtor was self-employed as an acupuncturist,

doing business as Life Gate Acupuncture, from which she derived net earnings that averaged

$1,000 to $2,500 per month.

11.     From April 2017 through December 2018, she worked as an acupuncturist, now

as an independent contractor working out of someone else's spa, for an average net income of

$1,500 per month.

12.     From January 2018 through February 2020, she owned and operated Life Gate

Holistic Living Center, Inc.  In this business, she treated patients as an acupuncturist, managed

an administrative assistant and a therapy staff of independent contractors ranging from 5 to 15

practitioners of various forms of alternative therapies, created programming, and marketed the

programming and services.  She received no income from the business while it operated.  The

corporation's income went entirely to the expenses of the business and was insufficient to pay

rent in full.  In the summer of 2018, the Debtor's child was diagnosed with their medical

condition, and her youngest child was born three months later.  The Debtor testified that the

ensuing stress made managing the business very difficult.  When the landlord was unwilling to

renegotiate the lease for the premises, the Debtor closed the business on February 28, 2020.

---

[7]  The $200,164.49 figure is from Debtor's trial affidavit dated March 28, 2022.  Exhibit D-1, which was also
admitted into evidence, is captioned "current statement of indebtedness" and references a balance of $203,532.88
(presumably as of the date the statement was printed on March 30, 2022).

13.     In the following two weeks, she returned to working as an acupuncturist, again as

an independent contractor working at an acupuncture center, for which she earned the net sum of

$264.  The start of the COVID-19 pandemic in March 2020 brought this work to an end.

14.     For the ensuing sixteen months, through June 2021, the Debtor was unemployed

and received unemployment compensation of $642 per week or less.

15.     From August 2021 through the date of the trial, the Debtor has been self-

employed as an acupuncturist, for which she earns between $0 and $350 per week and has

business expenses (a triple-net lease, office supplies, and other operating expenses) totaling

approximately $1,000 per month.

16.     The Debtor supplements her acupuncture income with short-term acting jobs. In

July and August 2021, the Debtor earned a total of $600 for acting in a production that required

an average time commitment of 9 hours per week.  She has since taken two other short-term

acting jobs. The first job lasted eight weeks, averaged 22.5 hours per week, and paid a total of

$2,952.  The second, ending in May 2022, ran for three months and required 10–15 hours per

week, for which she was paid $1,000 for the entire commitment.

17.     The Debtor further supplements her acupuncture income by part-time work at a

theater company as a program supervisor and acting teacher in the company's youth program.

She teaches one class on Saturdays.  She is paid $20 an hour for an average of 6 hours per week,

plus $50 per class.  This work is seasonal; no evidence was offered as to how many months of

the year the Debtor teaches these classes.

**d.  The Debtor's Loan Repayment History**

18.      Upon completing her graduate studies in 2005, when the Debtor first became

obligated to commence payments on her student loans, she attempted to consolidate her loans

into an IBRP, and she believed she had succeeded in doing so.  She later learned that she had

actually only placed her loan into deferment, during which interest continued to accrue but she had no payment obligation. The record is unclear when the Debtor learned that she had not in fact been in an IBRP and how long the deferment lasted. She testified that, when she became aware, she took steps to enroll in an IBRP. Trial Tr. 35:3–9; 36:8–37:9.

19.     From October 27, 2015 through June 23, 2019, the Debtor made 64 interest payments totaling $1,755.89 on her student loans to ECMC's predecessor in interest. The record includes no evidence as to what other student loan payments she may have made.

20.     Around the time of the last of her payments, in June 2019, the Debtor reapplied for an IBRP. While the application was being processed, her loan was placed in administrative forbearance, during which she was not obligated to make payments. The record does not indicate how long this forbearance lasted.

21.     In March 2020, payment obligations on student loans were universally placed on hold during the COVID-19 pandemic. As of the time of trial on April 5, 2022, this hold had not been lifted.

22.     At trial, the Debtor confirmed "she was in the income-based repayment program." Trial Tr. 53:21–25. She also acknowledged that if her debt was not ultimately discharged she would "continue to make payments through the income-based repayment plan." Trial Tr. 54:12–15. Given her testimony, I find that the Debtor is presently enrolled in a federal income-based repayment plan, and that the monthly payment is and will, for the foreseeable future, be affordable.[8] The evidence includes no details of the terms of the repayment plan. Although the

---

[8] In the Second Amended Complaint, the Debtor states that she "has been, since August 24, 2013, participating in the William D. Ford Program … relative to the repayment of these student loans." 2d Am. Compl. ¶ 46. She further alleges "[t]he Ford Program requires the Plaintiff to make monthly payments for a specific period of time; typically, the Ford program requires at least 25 years in repayment before a person can apply for cancellation of the loan." *Id.* ¶ 47. In ECMC's Pre-trial Brief and its answer to the Second Amended Complaint, ECMC takes the position that the Debtor is not currently in the Ford Program, but that the Debtor's student loan debt is through the Department of Education's Federal Family Educational Loan ("Ffel") Program, and the Debtor is in an income based repayment

Debtor has submitted evidence of certain of her and Elena's monthly expenses, it is unclear what the amount of her monthly loan payment is under the IBRP, from which I infer that the payment is presently zero or nominal. The Debtor has testified that, if she were not in an IBRP, her monthly payment on her student loans would be $1,500.

### e. Assets

23.     The Debtor has accumulated no substantial assets. She owns no real estate and has no retirement account. There is no evidence of any significant asset to which she could have recourse to pay her student loans.

24.     The Debtor and Elena jointly own a 2015 Toyota Corolla, on which they owe a balance of $2,280. They expect to have paid this vehicle in full by June 2023.

25.     The family's second vehicle, a 2013 Honda Odyssey, is in the name of Elena alone. She owes $8,803 on this vehicle and is paying this loan at $285 per month.

### f. Present Family Income

26.     In her employment at the private school, Elena earns a gross annual salary of approximately $72,000. She has no additional income.

27.     From her present work—including as a self-employed acupuncturist, her acting work, and her work at the theater—the Debtor expects to earn approximately $8,000 per year.[9]

28.     The Debtor testified that presently their gross monthly family income totals $6,150 per month (or $73,800 per year) and that in the next 12 months she expected a total gross

---

plan under the Ffel Program. *See* 34 C.F.R. § 682.215, *et seq*. ECMC's filings are not evidence, and the Court was presented with the Debtor's testimony as to participation in the Ford Program. The distinction does not appear to be relevant however, because even ECMC acknowledged in its answer that "[b]y law, the Debtor has the ability make her loan payments through the income-based repayment ("IBR") plan that is offered through the Ford Program." Answer to 2d Am. Compl. ¶ 46. This appears to be as a result of the potential to consolidate loans into the Ford Program.

[9] I understand this sum to be net of the expenses the Debtor incurs in her acupuncture practice, which total approximately $1,000 per month.

household income of $80,000 per year ($72,000 from Elena and $8,000 from the Debtor), which

amounts to $6,667 per month.  Debtor's Trial Aff. ¶¶ 41 and 62.  The Court infers that the

reference to "gross household income" means that the $8,000 amount earned by the Debtor is

after payment of the business expenses of the Debtor from her acupuncture business.

29.     The Debtor and Elena file joint federal tax returns.  In tax years 2018, 2019, and

2020, by virtue of the refundable portion of the child tax credits to which they were entitled, they

owed no federal income taxes.  Their refundable credits, which totaled $4,200 in 2018, $3,056 in

2019, and $1,490 in 2020, entitled them to a full refund of all federal income taxes that had been

withheld from Elena's salary.[10]  Because the joint returns for 2018 and 2019, and presumably for

2020 given the additional child tax credit reflected on the 2020 federal return (even though there

was no accompanying schedules in support), show that the Debtor and Elena had child tax

credits in excess of their tax liability, they could apply refundable additional child tax credits to

obtain a refund of their tax liability.  The Debtor does not contend that her family continues to

receive and be eligible for refundable credits of this nature, particularly since certain

enhancements to child tax credits implemented during the pandemic have expired, but such

circumstance is ultimately based on the amount of the household's tax liability.  In view of the

diminishing trend of these refundable credits from 2018 to 2020, I find that the Debtor and Elena

likely will not continue to receive refundable additional child tax credits, but would still be

eligible for nonrefundable child tax credits to reduce their increased tax liability resulting from

future increases in income while their children remain eligible dependents.

---

[10] The Debtor testified that she had not received a W-2 form in many years and that she paid no quarterly taxes to
the federal government for her self-employment income in 2019 or 2020.

### g. Present Family Expenses

30.     The family resides in housing that is provided by Elena's employer, and, therefore, they have no rent or housing cost.

31.     By virtue of child tax and other credits to which they are entitled, the Debtor and Elena have no liability for federal income taxes and have received full refunds of any amounts withheld in recent years.  Debtor's Exhibit 54, her joint 2018 federal income tax return and supporting documents, shows that she paid a self-employment tax in 2018 of $212 and that she and Elena together annually paid Social Security taxes of $3,557, Medicare taxes of $832, and state income taxes of $2,478, presumably attributable to Elena's salary.  In 2018, the return reflected Elena's taxable W-2 wage income in the amount of $56,738 and business income of $1,501 to which a loss carryforward from the Debtor's business applied, resulting in qualified business income of (-$14,129).  Through Debtor's Exhibit 55, her joint 2019 federal tax return with supporting documents, the Debtor has submitted evidence that she and Elena together annually paid Social Security taxes of $3,663, Medicare taxes of $857, and state income taxes of $2,477, again presumably attributable to Elena's salary.  The 2019 return reflected Elena's taxable W-2 wage income of $58,414 and that the Debtor had, per her K-1, qualified business income of (-$2,972).  Debtor's joint 2020 federal tax return, Debtor's Exhibit 56, which did not include any supporting schedules or worksheets, reflects taxable W-2 wage income of Elena of $56,504 and that the Debtor presumably had qualified business income of $9,465.  It is unclear how much was paid in Social Security taxes, Medicare taxes, and state income taxes in the 2020 tax year.  The amount and nature of the Debtor's and Elena's income has had some variations in recent years, but the Debtor did not present any contrary evidence suggesting that they did not otherwise continue to pay taxes in roughly the same amounts.  Considering the self-employment tax paid in 2018 in the total amount of $212 and the Social Security taxes, Medicare taxes, and

state income taxes from the 2019 return, these tax payments total approximately $7,209 per year, or $601 per month.

32.      Two of the couple's children attend private schools.  The cost of their education is funded primarily by financial aid from the respective schools, and it appears that any remaining amounts were funded from federal tax refunds received from the preceding tax year.   Although the Debtor testified specifically regarding the refund of $4,372 for tax year 2020 as being used to pay any outstanding tuition amount in 2021, the Court infers that, to the extent there were outstanding tuition amounts in other years, they were also paid from amounts refunded and would be similarly funded through financial aid and potential tax refunds in the foreseeable future.

33.      Two children also take music lessons, the cost of which is wholly funded by a combination of scholarships from the music school and funding of the balance by the Debtor's father-in-law.

34.      Elena makes payments on her own student loans in the amount of $53 per month.[11]  Elena owes $248,000 on her student loans and her monthly payment is the amount she pays under an income-based repayment plan in which she is enrolled.  These payments are presently suspended by the general moratorium on student loan payments that was instituted at the start of the COVID-19 pandemic, but as the moratorium appears to be winding down, I conclude this expense should be counted as a current family expense.

---

[11]  Elena testified that she had applied for "public service loan forgiveness" in 2019, but was told that her loan consolidation was the "wrong type." Trial Tr. 20:23–21:5.  She then testified that she "did a federal direct consolidation in 2019 and maybe early 2020" and that she received a notice that she may be eligible, but there were issues regarding her eligible years of payments.  Trial Tr. 21:9–12.  She is making payments under the federal direct consolidation and has also applied "again with the waiver program that was opened up on October 1st of 2021 and through the Department of Education." Trial Tr. 21:11–15.  Her loan forgiveness application was being considered, but had not been approved at the time of trial.

35.    The family has health insurance through Elena's employment.  By withholding from Elena's salary, they spend $575 per month on premiums for this insurance.

36.    The employer-provided health insurance from Elena's employment has a $4,000 annual deductible, which averages to $333 per month.  The children are also insured by MassHealth, as a secondary insurer, which helps to cover amounts that the primary insurer does not cover.  One child also has MassHealth Disability for assistance in covering expenses for certain appointments, supplies, and medication.  Notwithstanding this coverage, they incur approximately $370 per month in medical expenses that, because of deductibles and co-pays, are not covered by any insurance.

37.    They pay $945 per month for daycare for their youngest child (three days each week), $75 for babysitting to permit the Debtor to work on Saturdays, and $10 per month for subsidized afterschool care, for a total of $1,030 per month spent on childcare.

38.    The family spends $250 to $300 month dining out, which I have averaged to $275 per month, and approximately $1,000 per month on groceries when school is not in session, presumably from the second week of June through early September consistent with Elena's testimony about the length of the school year.  The Debtor testified that the family's grocery expense is less during the school year when they have access to the dining hall, but did not provide the decreased amount.  Although the reduced monthly amount during the school year could be significantly more, I infer that the dining hall access, even if only for Elena, would equal a reduction in the monthly grocery expenditure during the school year to $850 for those months, with an average over the entire year of approximately $881 per month in grocery expenses.

39.     They also spend, monthly, $162 for mobile phone coverage, $106 for home phone/internet/television, $125 on clothing, and $125 on recreation.[12]

40.     The Debtor and Elena own two cars. For these, they collectively spend $530 per month on loan payments, $550 per month on gas, repairs, and maintenance, and $315 per month on insurance, for a total of $1,395 per month on automotive expenditures.

41.     In sum, the Debtor and Elena have the following approximate monthly expenses:

| | |
|---|---|
| Taxes | $601 |
| Health Insurance Premiums | $575 |
| Medical | $703 |
| Childcare | $1,030 |
| Groceries/Dining Out | $1,156 |
| Automotive | $1,395 |
| Cell phones | $162 |
| Home phone/Internet/Television | $106 |
| Recreation | $125 |
| Clothing | $125 |
| Elena's Student Loan | $53 |
| **TOTAL** | **$6,031** |

42.     Their regular monthly household expenses thus total approximately $6,031, which is $636 less than their gross monthly income of $6,667. The estimated surplus of $636 affords them some margin for inevitable contingencies and necessities not captured by this list.[13]

---

[12] The Debtor testified the family spends between $50 to $200 per month on recreation, which I have averaged to $125 per month.

[13] In the Debtor's Brief, the Debtor asks the Court to consider that she has a monthly deficit of $916. She cites the schedules of income and expenses she filed in her bankruptcy case, reflecting estimated income and expenses as of the date of her bankruptcy filing. She appears to cite the schedules in her brief primarily to bolster her position that household income in a chapter 7 case should not be examined, attempting to distinguish a chapter 13 case she cited where household income was examined by a court on the basis that the schedules in that case reflected excess income that could be used to pay the student loans at issue. As will be discussed, in the context of determining whether a debtor demonstrates undue hardship, the Court may consider all sources of income, including spousal support. But, for whatever purpose the Debtor cited to her Schedules I and J in her post-trial brief, however, they were never placed in evidence.

The Debtor states that the Court may take judicial notice of documents filed in the bankruptcy case. This is true for the fact that the schedules were filed, but not for the truth of the statements they contain. *See LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999). For any other purpose, a party would need to have requested that the Court take judicial notice before the presentation of evidence had closed so that the

43.     The Debtor and Elena are making ends meet, albeit with some help because of: refundable additional child tax credits (and future child tax and other credits) that reduce their tax liability; income-based repayment plans that dramatically reduce the monthly student loan payments of both the Debtor and Elena; MassHealth, which supplements their health coverage; financial aid two of the children receive for tuition; and gifts and financial aid received for music lessons.

44.     I find that the family is living frugally, but not below a minimal standard of living.

**h.  Prospects for Future Income and Debt Payments**

45.     The Debtor is well educated, has training and expertise in acupuncture, and has operated an acupuncture practice of her own.  She also speaks and reads Spanish fluently, skills that helped her obtain her present theater job.  The amount the Debtor can presently earn is limited by the time constraints imposed by her childcare obligations, and these are unlikely to change for the next two or three years until her youngest enters school.  Even then, the constraints will lessen only slowly and incrementally, as her children learn to navigate their medical conditions more independently.  Still, the Debtor is in her mid-forties, has many remaining earning years, and has demonstrated engagement in several fields.

46.     The Debtor has experienced certain health issues.  Around the time of the closure of her business in February 2020, she was diagnosed with several medical conditions possibly related to the stress of running the business while caring for a newborn and addressing her older child's newly diagnosed condition.  She describes her health as fair and does not contend that these conditions are uncontrolled or that they prevent her from returning to paid work, which she

---

opposing party could have had an opportunity to respond to the request and offer rebuttal evidence if necessary.  The Debtor did not introduce these schedules at trial and, therefore, the schedules are not evidence.

has already done, albeit to a more limited extent for reasons unrelated to her own health. She has not established that she will be unable, eventually, to increase her income and make payments on her student loans.

47.    Elena, too, has the ability to increase her earnings in the future and the availability of more spousal income to address the family's needs could conceivably free up more of the Debtor's earnings to fund her student loan payments. Elena has a law degree. She has considered other jobs that use her legal training and pay more but has found nothing that would make economic sense for her to accept at this time. Her current position provides the family's housing, so any other position would have to pay enough to fund the cost of housing for a family of five. She is also concerned, justifiably, that a higher salary would disqualify her for, or at least increase the cost of, the state-subsidized health insurance that her children receive and rely on. Another position would, therefore, have to provide adequate health insurance and enough further compensation to permit the family to afford the deductibles and co-pays that MassHealth now covers for them. The evidence does not establish that it would be impossible, or even unlikely, for her to find a position that meets these requirements.

48.    Furthermore, while increased income for both the Debtor and Elena would presumably result in increased tax liability for federal and state income taxes, they would be eligible to reduce their tax burden by the child tax credit and other credits and no evidence was provided that demonstrated an increased tax burden would prohibit the Debtor from making student loan payments.

49.    In addition, some expenses are likely to decrease over time. The $945 per month that they presently expend for daycare for their youngest will become unnecessary, at least during the school year, when the child enters school. The $250 per month that they presently pay on the loan for their Toyota Corolla will be fully paid in four months, though this

expenditure is likely to be replaced by increased repair costs and, eventually, the need for a

replacement vehicle.

## IV.    DISCUSSION

### a.  Immediate or Prospective Discharge under § 523(a)(8)

The Debtor seeks a determination under § 523(a)(8) against ECMC that the student loan

debt held by ECMC is discharged because excepting that debt from discharge would impose an

undue hardship on her and her dependents.  The alleged undue hardships on which this

determination is based include both the Debtor's present financial circumstances and the future

tax consequences of the forgiveness of debt that she anticipates will occur at the end of her

repayment plan.

### i.  The Parties' Arguments

As a preliminary matter, the parties diverge as to the standard to be applied for

determining undue hardship.  The Debtor urges the Court to apply the totality-of-the-

circumstances test, while ECMC asks the Court to apply the *Brunner* test, articulated in *Brunner*

*v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987).  In addition to her

position on the standard to be applied, the Debtor makes three further arguments.  First, she

argues that in determining undue hardship in a chapter 7 case that is not a joint case, the Court

should not take into account the income of her non-debtor spouse.  Second, she contends that the

evidence establishes that the prospects for increasing her income in the future are so bleak as to

warrant a discharge of the student loan debt.  And third, she asserts that if the Court does not

discharge her debt now, interest will continue to accrue for many years, the import of which is

presumably that despite her participation in an IBRP, without payments against principal, the

amount that could potentially be forgiven may hamstring the Debtor with potential tax liability

from forgiveness of indebtedness income.

ECMC disagrees.  First, ECMC argues that current unemployment or underemployment is not sufficient to justify a finding of undue hardship; rather the Debtor must also show that the prospects of her income increasing in the future are so "dim" as to warrant a discharge, and she has not carried this burden.  ECMC's Br. 18.  Second, ECMC argues that case law establishes that it is appropriate in determining undue hardship to consider not only the Debtor's income but that of Elena as well.  Third, ECMC acknowledges that although the Debtor's income has suffered in recent years, the prospect of its increasing appreciably in both the near and long term, as her children grow older, is strong.  Fourth, ECMC argues that, although the raising of children may be difficult at times, it does not amount to an undue hardship; nor should undue hardship be found in the fact that the ordinary difficulties are compounded by medical issues affecting two of the children, because as they get older they will learn to cope with these issues on their own. Fifth, ECMC argues that the Debtor has the ability to pay her student loan debt affordably through the IBRP in which she is participating, and that, in view of this option, nondischarge of her debt would not constitute an undue hardship.  Additionally, ECMC recognizes that partial discharge is within the equitable powers of the Court under § 105(a) and that, if it is determined that an undue hardship exists, nondischargeability should be limited to only the portion of the debt that Court finds constitutes an undue hardship.

Concerning ECMC's argument as to the IBRP, the Debtor replies that the repayment plan itself would create an undue hardship by resulting in forgiveness of a large amount of debt at the conclusion of the repayment period that would result in income tax debt "that may or may not be forgiven as part of some tax procedure."  Debtor's Br. 25.

**ii.  Applicable Legal Standards**

The dischargeability of student loans is governed by § 523(a)(8), which provides:

A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

(8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—

(A)

(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

(ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

11 U.S.C. § 523(a)(8).[14]  "The creditor bears the initial burden of establishing that the debt is of the type excepted from discharge under § 523(a)(8)."  *Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon)*, 435 B.R. 791, 796 (B.A.P. 1st Cir. 2010) (appeal concerning bankruptcy court's second determination of dischargeability after remand).  The debtor then bears the burden of proving undue hardship.  *See id*.  The standard of proof is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287 (1991).  The United States Court of Appeals for the First Circuit (the "First Circuit") has said that the debtor's burden under § 523(a)(8) amounts to "a formidable task," because Congress has determined that in order to ensure the continued viability of the student loan program, the discharge of student loan debt shall be the exception and not the rule.  *Nash v. Conn. Student Loan Found. (In re Nash)*, 446 F.3d 188, 191 (1st Cir. 2006).

The Bankruptcy Code does not define "undue hardship" under § 523(a)(8), and the First Circuit has not mandated a particular test for proving undue hardship.  The majority position is the test described by the United States Court of Appeals for the Second Circuit in *Brunner*,

---

[14]  In this decision, educational loans and student loans are used interchangeably, notwithstanding that § 523(a)(8) describes debt that may be excepted from discharge as certain "educational loans."

which has since been adopted by eight other circuit courts of appeal.[15]  To establish undue

hardship under *Brunner*, a debtor must show "(1) that the debtor cannot maintain, based on

current income and expenses, a 'minimal' standard of living for herself and her dependents if

forced to repay the loans; (2) that additional circumstances exist indicating that this state of

affairs is likely to persist for a significant portion of the repayment period of the student loans;

and (3) that the debtor has made good faith efforts to repay the loans."  *Brunner*, 831 F.2d at 396.

The United States Court of Appeals for the Eighth Circuit has adopted the competing,

minority position embodied in the "totality-of-the-circumstances test."  *See Long v. Educ. Credit*

*Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir. 2003).  Under this test,

> courts should consider: (1) the debtor's past, present, and
> reasonably reliable future financial resources; (2) a calculation of
> the debtor's and her dependent's reasonable necessary living
> expenses; and (3) any other relevant facts and circumstances
> surrounding each particular bankruptcy case. Simply put, if the
> debtor's reasonable future financial resources will sufficiently
> cover payment of the student loan debt—while still allowing for a
> minimal standard of living—then the debt should not be
> discharged. Certainly, this determination will require a special
> consideration of the debtor's present employment and financial
> situation—including assets, expenses, and earnings—along with
> the prospect of future changes—positive or adverse—in the
> debtor's financial position.

*Id.* at 554–55 (citations omitted).

While the First Circuit has not decided which test should govern the meaning of undue

hardship, the United States Bankruptcy Appellate Panel for the First Circuit (the "BAP") has

approved the application of the totality-of-the-circumstances test, *see In re Bronsdon*, 435 B.R.

---

[15]  *See Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 400 (4th Cir. 2005); *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382 (6th Cir. 2005); *Educ. Credit Mgmt. Corp. v. Polleys (In re Polleys)*, 356 F.3d 1302 (10th Cir. 2004); *Hemar Ins. Corp. of Am. v. Cox (In re Cox)*, 338 F.3d 1238, 1241 (11th Cir. 2003); *U.S. Dep't of Educ. v. Gerhardt (In re Gerhardt)*, 348 F.3d 89, 91 (5th Cir. 2003); *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1112 (9th Cir. 1998); *Pa. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 305 (3d Cir. 1995) *cert. denied*, 518 U.S. 1009 (1996); *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993).

at 800, as have most of the bankruptcy judges in this District to have addressed the issue, *see,*

*e.g., Sanborn v. Educ. Credit Mgmt. Corp. (In re Sanborn)*, 431 B.R. 5, 7–8 (Bankr. D. Mass.

2010) (Bailey, J.); *Paul v. Suffolk Univ. (In re Paul)*, 337 B.R. 730, 738 (Bankr. D. Mass. 2006)

(Feeney, J.); *Brunell v. Citibank (South Dakota) N.A. (In re Brunell)*, 356 B.R. 567, 575–76

(Bankr. D. Mass. 2005) (Hillman, J.); *Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks)*, 331 B.R.

18, 32 (Bankr. D. Mass. 2005) (Boroff, J.); *Dolan v. Am. Student Assistance, et al. (In re Dolan)*,

256 B.R. 230, 238 (Bankr. D. Mass. 2000) (Rosenthal, J.); *see also Parvizi v. U.S. Dep't of Educ.*

*(In re Parvizi)*, No. 18-30578-EDK, 2021 WL 1921121, at *5 (Bankr. D. Mass. May 13, 2021)

(Katz, J.), *aff'd*, 641 B.R. 729 (B.A.P. 1st Cir. 2022) (acknowledging that the parties stipulated to

the application of the totality-of-the-circumstances test and further stating such test has been

previously adopted by the Court, along with the other bankruptcy courts in the District).   In

comparing the two tests in *In re Bronsdon*, the BAP, relying on the analysis by the court in *In re*

*Hicks*, stated, among other things, that the tests diverge in form and that the *Brunner* test

ultimately "'test[s] too much'" in requiring "additional evidence of evidence of 'unique' or

'extraordinary' circumstances amounting to a 'certainty of hopelessness.'"   *In re Bronsdon*, 435

B.R. at 799 (quoting *In re Hicks*, 331 B.R. at 27–28).   Further, the BAP highlighted *Brunner*'s

focus on a debtor establishing good faith efforts to repay the educational loans at issue as being

incongruous with the statute in absence of a challenge by "[t]he party opposing discharge of a

student loan [which] has the burden of presenting evidence of any disqualifying factor, such as

bad faith."   *Id*. at 800.   For the reasons articulated by the majority in *In re Bronsdon*, 435 B.R. at

797–800, I will apply the totality-of-the-circumstances test in this case.

   "Under any test assessing eligibility for discharge of student loan debt, [a debtor] must

show that her current inability to maintain a minimal standard of living if forced to repay the

debt will continue into the future."   *In re Nash*, 446 F.3d at 192; *see also Smith v. Educ. Credit*

*Mgmt. Corp. (In re Smith)*, 328 B.R. 605, 611 (B.A.P. 1st Cir. 2005) ("Under either the totality

of the circumstances test or the *Brunner* test, a debtor must show not only that her current

income is insufficient to pay her student loans, but also that her prospects for increasing her

income in the future are too limited to afford her sufficient resources to repay the student loans

and provide herself and her dependents with a minimal (but fair) standard of living." (citations

omitted)).

The Debtor has three minor dependents whom she is raising with her employed spouse.

The law is well settled that in deciding whether not discharging student loan debt would impose

an undue hardship on debtors and their dependents, courts should consider the income of a

spouse or other household members and the extent to which such income meets the needs of the

household, regardless of the chapter under which the case was commenced. *See, e.g., Lorenz v.*

*Am. Educ. Servs./Pa. Higher Educ. Assistance Agency (In re Lorenz)*, 337 B.R. 423, 432 (B.A.P.

1st Cir. 2006) (determining that "[s]ection 523(a)(8) requires bankruptcy courts to consider the

income of a non-debtor spouse when deciding whether excepting a [chapter 7] debtor's student

loans from discharge will impose an 'undue hardship' on the debtor"); *In re Dolan*, 256 B.R. at

236 (same); *see also Sederlund v. Educ. Credit Mgmt. Corp. (In re Sederlund)*, 440 B.R. 168,

172–73 (B.A.P. 8th Cir. 2010) (considering fact that chapter 7 debtor's long-term, live in

boyfriend paid over half of the household expenses in finding debtor could not discharge student

loan debt). *But see Reynolds v. Pa. Higher Educ. Assistance Agency (In re Reynolds)*, 425 F.3d

526, 535–36 (8th Cir. 2005) (acknowledging that the income and expenses of couple are

combined for the purpose of examining a household's finances, but majority declined to attribute

surplus entirely to debtor's creditors for payment of student loans where "the debtor and non-

debtor spouse have contributed about equally to the family income and expenses").

Accordingly, I will consider the income of Elena in determining the Debtor's household income

as part of the undue hardship analysis.

The Debtor in this case is also enrolled in an IBRP.[16]  The availability of an income-

dependent repayment plan, including an IBRP, is a factor to be considered in the undue hardship

analysis.  *See Educ. Credit Mgmt. Corp. v. Bronsdon (In re Bronsdon)*, 421 B.R. 27, 37 (D.

Mass. 2009) (on appeal of bankruptcy court's initial determination of dischargeability and

concluding that "the availability of the ICRP option must be considered and given some weight

without necessarily being decisive").  How such a plan affects that analysis will depend on

whether and if the plan's features mitigate the hardship that would be imposed by nondischarge

of the debt or, on the other hand, fail to do so and perhaps introduce new burdens.  Where the

IBRP would make debt service affordable, the availability of this option can be cause for a

determination, under the totality-of-the-circumstances test, that nondischarge would not impose

an undue hardship.  *See*, *e.g.*, *Parvizi v. United States (In re Parvizi)*, 641 B.R. 729, 750–51

(B.A.P. 1st Cir. 2022) (determining, in case where debtor had over $650,000 in outstanding

student loan debt, but debtor had enough surplus each month to make the estimated $80 monthly

payments under the REPAYE program, a form of income-dependent repayment plan, bankruptcy

court applying the totality-of-the-circumstances test had not erred in considering the availability

of this option and ruling on the basis of the debtor's eligibility to participate in such a program

that repayment of the debt would not impose an undue hardship); *In re Bronsdon*, 421 B.R. at 37

(holding that it had been improper "to eliminate from the [undue hardship] analysis a program to

---

[16]  The Debtor has stated that she is enrolled in an income-*based* repayment plan, a repayment option under the
federal Ford Program. This same program, at present, also includes other income-dependent repayment plans,
including Pay As You Earn ("PAYE"), Revised Pay As You Earn ("REPAYE"), and income-contingent repayment
plans ("ICRPs").  *See* 34 C.F.R. § 685.209.  Though REPAYE plans and ICRPs differ from IBRPs in some respects,
they are similar, *compare* 34 C.F.R. § 685.209 (income-contingent repayment plans) *with* 334 C.F.R. § 685.221
(income-based repayment plan), and I find that the analysis in cases regarding the relevance of REPAYE plans and
ICRPs to dischargeability of student loan debt under § 523(a)(8) applies equally to IBRPs.

restructure the debt that would result in no foreseeable payments and only a speculative cost to

the debtor at some time in the distant future"); *but see Lee v. Regions Bank Student Loans (In re*

*Lee)*, 352 B.R. 91, 96–97 (B.A.P. 8th Cir. 2006) (determining that "the availability and terms of

the ICRP should not be given undue weight under the totality of circumstances analysis because

it serves a fundamentally different purpose than the discharge provisions (and exceptions thereto)

of the Bankruptcy Code . . . Some aspects of the ICRP might even be viewed as inimical to the

goals of the fresh start because the ICRP allows for negative amortization of the student loan

debt and a potentially significant tax bill if the student loan is ultimately forgiven after 25

years"); *Brooks v. Educ. Credit Mgmt. Corp. (In re Brooks)*, 406 B.R. 382, 394 (Bankr. D. Minn.

2009) (acknowledging that "[b]ecause of the differing purposes, the economic evaluations

undertaken by ICRP administrators and Bankruptcy Court judges differ significantly");

*Limkemann v. U.S. Dep't of Educ. (In re Limkemann)*, 314 B.R. 190, 195 (Bankr. N.D. Iowa

2004) (concluding that "requiring a bankrupt debtor to participate in an ICRP whenever eligible

in lieu of receiving a discharge deprives the bankruptcy court of its role in determining undue

hardship"); *Johnson v. Educ. Credit Mgmt. Corp. (In re Johnson)*, 299 B.R. 676, 682 (Bankr.

M.D. Ga. 2003) (concluding "[i]f Congress had intended the question of dischargeability of

student loans to be delegated to a nonjudicial entity, no matter how fair its formulas and

intentions may appear, it could have provided for such.").[17]  On the other hand, an IBRP might in

---

[17] One commentator even suggests, a "court also should not consider whether the debtor could repay the loan over
an extended term[,]" explaining:

> The Secretary of Education can restructure specified direct federal and federally guaranteed
> educational loans where the borrower is in default so as to force the borrower to repay the loan
> under an income-based repayment plan over a period of at least twenty years. Because the
> periodic repayment amount under such a plan is invariably a small percentage (10%-20%) of
> the debtor's adjusted gross income above 150% of the relevant poverty level, presumably the
> debtor would always be able to pay this amount. This means that the debtor could never
> demonstrate that she would be unable to repay the loan and meet all of her other living
> expenses. If the debtor performs to the letter under such a plan, her unpaid principal and/or
> interest may be forgiven and she may have to pay income tax on this amount. Furthermore, if

some circumstances not alleviate but contribute to creating an undue hardship. *See In re*

*Bronsdon*, 421 B.R. at 36 (acknowledging that "[t]here are possible circumstances in which even

the relatively lenient terms of the ICRP would impose, or contribute to creating, an undue

hardship."); *see also Strand v. Sallie Mae Servicing Corp. (In re Strand)*, 298 B.R. 367, 376

(Bankr. D. Minn. 2003) (determining that a repayment plan is "something to consider, when the

evidence of such a program and its availability and impact upon a given debtor is made clear in

the record, and when the debtor's reliable future financial resources, reasonable and necessary

expenses, and other circumstances are not otherwise overwhelmingly determinative in any event

[but noting that] in the event of a debtor's fruitless zero-payment-required participation in such

an income contingent repayment program, the derivative financial woes would be significant.

With interest accruing for twenty five years, and very little or absolutely no payment against the

principal, [the debtor] would be hamstrung into poverty for the rest of his life").

The Debtor has argued that her IBRP provides for forgiveness of the remaining debt at

the end of its term, which forgiveness would result in significant debt-forgiveness income and

---

the debtor were to default on such a plan the federal government could enforce the payment
obligation without any time limit whatsoever until the debtor becomes permanently disabled or
dies.

…

When § 523(a)(8) was first enacted in 1978, the customary period of repayment for a federal
guaranteed educational loan was generally five to ten years and a debtor could in any event
discharge any educational loan by filing bankruptcy more than five years after the first
payment thereon came due. Also, income-based repayment plans did not become available
until 1992 at the earliest. Because the court ordinarily does not have the authority to rewrite the
terms of an educational loan, because the debtor could virtually never prove undue hardship
under an income-based repayment plan and because the repayment period is so protracted for
such a plan, the court must use the contractual terms of the loan itself including the repayment
period when calculating whether the debtor will be able to repay it.

Alan M. Ahart, *How the Courts Have Gone Astray in Refusing to Discharge Student Loans: The Folly of Brunner,
of Rewriting Repayment Terms, of Issuing Partial Discharges and of Considering Income-Based Repayment Plans,*
95 Am. Bankr. L.J. 53, 77–78 (2021); *cf.* John Patrick Hunt, *Help or Hardship?: Income-Driven Repayment in
Student-Loan Bankruptcies*, 106 Geo. L.J. 1287, 1333 (2018) (arguing, among other things, that if an income-driven
repayment plan ("IDR") "would extend the debtor's repayment period, [its availability] should not count against
discharge if (1) the debtor is unable to maintain an above-minimal standard of living while making IDR payments,
and (2) this condition will persist for a significant portion of the IDR repayment period").

consequent federal and state income tax liabilities that would constitute undue hardships.  As

part of a debtor's general burden of proving undue hardship, a debtor making this argument bears

the burden of proving that the IBRP would have this consequence.  *See, e.g., Gesualdi v. Educ.*

*Credit Mgmt. Corp. (In re Gesualdi)*, 505 B.R. 330, 346 (Bankr. S.D. Fla. 2013) (concluding

"even under existing tax laws, a taxpayer only has tax liability for debt forgiveness if he is

solvent, in essence, if the amount of his assets exceed the amount of liabilities, including the debt

that is being cancelled. . . . The amount of this student loan would be included in any calculation

of the [debtor's] solvency, and the [debtor] did not put on any evidence to show that his assets,

even at the time of trial, exceed his liabilities."); *Educ. Credit Mgmt. Corp. v. Rhodes*, 464 B.R.

918, 926 (W.D. Wash. 2012) (noting the debtor "did not submit evidence that he would incur

such tax liability, despite the fact that he bore the burden of doing so" and that "courts have

emphasized that cancellation of debt after 25 years of participation in income-based plans only

results in tax liability if the borrower's assets exceed his liabilities immediately prior to the

cancellation of the debt").

### iii.  Undue Hardship

Here, it is undisputed that the Debtor's debt to ECMC is of the type that could be

excepted from discharge under § 523(a)(8).  The sole issue is whether excepting that debt from

discharge would impose on the debtor and her dependents, her three children, an undue hardship,

which falls on the Debtor to prove by a preponderance of the evidence.  At best a thorny task, my

determination of undue hardship in this case is even more difficult because of certain gaps in the

record.

The evidence shows that at the time of trial, the Debtor's household had monthly

expenses totaling $6,031 and income that met those expenses with a monthly surplus.  Under the

IBRP in which she is participating, her monthly payment on her student loans is nominal or zero,

which is not a current burden.  Her family enjoys a slightly better than minimal standard of

living.  There is no way to know how long this state of affairs will continue, but the Debtor and

Elena both have the education, marketable skills, and potential to earn more in the future than

they presently do.  As their children grow older, they likely will increase their earnings, and there

is no evidence in the record demonstrating that this is not a realistic possibility.  This would

allow the Debtor to make payments on her educational debt in the future without undue burden,

even if payments were adjusted to reflect increased income.

The Debtor's real contention is that the IBRP creates a burden for her because, at the

conclusion of its term, the remaining debt will be forgiven.  She reasons that this forgiveness

would constitute income in the amount of the debt forgiven and that the resulting taxes on this

income would impose an undue hardship on her and any of her children that remain dependents

at that time. The Debtor asks the Court to make a determination that her participation in the

IBRP will, itself, impose on her an undue hardship.  This determination involves both

consideration of federal and state tax laws and findings of fact as to the circumstances to which

those laws will be applied in the future, when, upon completion of her IBRP, any of her

remaining debt would be forgiven under the Ford Program.

In *In re Bronsdon*, where the bankruptcy court had determined that a debtor's

participation in an ICRP would result in a tax liability, the United States District Court for the

District of Massachusetts (the "District Court") held that this legal conclusion was incorrect,

vacating the decision and remanding the matter back to the bankruptcy court.  *See In re*

*Bronsdon*, 421 B.R. at 35, 37.  Addressing this issue as it pertains to federal income taxation, the

District Court first concluded that a tax does not necessarily arise from debt forgiveness:

> [T]ax liability is not certain to flow from the discharge of the
> remaining debt at the end of the 25-year period [the term of the
> ICRP at issue]. 26 U.S.C. § 108(a)(1)(B) excludes from gross

> income "any amount which (but for this subsection) would be
> includible in gross income by reason of the discharge (in whole or
> in part) of indebtedness of the taxpayer if the discharge occurs
> when the taxpayer is insolvent," provided that, under § 108(a)(3),
> "the amount excluded under paragraph (1)(B) shall not exceed the
> amount by which the taxpayer is insolvent." For the "purposes of
> [section 108], the term 'insolvent' means the excess of liabilities
> over the fair market value of assets" at the time immediately before
> the discharge of the debt. 26 U.S.C. § 108(d)(3); *see Merkel v.
> Comm'r of Internal Revenue*, 192 F.3d 844 n. 3 (9th Cir.1999)
> (applying definition). The overall effect of these provisions is that,
> at the end of the 25-year period, a participant in the ICRP will
> experience a taxable event only to the extent that, after the
> discharge, her assets exceed her liabilities.

*Id.* at 35.

It follows that, for purposes of federal income taxation, the tax consequences of debt

forgiveness will depend on a debtor's solvency at the time of forgiveness. *See, e.g., Arroyo v.

U.S. Dep't of Educ. (In re Arroyo)*, 470 B.R. 18, 31 (Bankr. D. Mass. 2012) (finding debtor did

not meet burden of demonstrating she would not be insolvent at the end of her ICRP payments,

stating the "[d]ebtor has offered no projections regarding the extent of her solvency or

insolvency at the end of the period [and in] view of the fact that (i) she has at present almost no

assets and at least $300,000 in Student Loan debt and (ii) under an ICRP she would be paying on

this debt for the balance of such a plan to the extent of her ability, it is highly unlikely that, upon

completion of her payments, her assets would exceed her liabilities").  If a debtor has no assets

of significance at that time, taxable income will be minimal or nothing.  If, on the other hand, a

debtor is able to accumulate assets, equity, and solvency while servicing student loan debt,

forgiveness may result in taxable income.

Even where the forgiveness results in a tax, however, the tax will not necessarily

constitute an undue burden and several circumstances would need to be considered.  To what

extent might the debtor have succeeded in paying down the debt?  What resources will the debtor

have accumulated to service the resulting tax debt?  How adequate will a debtor's resources be to

pay any tax debt?  If debtor's resources are inadequate, what other options might then exist for

addressing that debt, such as an offer in compromise?  *See, e.g., In re Paul*, 337 B.R. at 738

(rejecting argument that tax consequence of ICRP debt forgiveness is inequitable because (i) "the

[d]ebtor's position could have improved to the point where she repaid the full amount of the

debt" or (ii) "the [d]ebtor could enter into the offer in compromise program and reach a

settlement agreement with the Internal Revenue Service").

A debtor contending that tax forgiveness at the end of an IBRP will create an undue

burden must thus demonstrate both (i) that there will be tax consequences and (ii) that those tax

consequences will constitute an undue burden.  IBRPs last many years, and some debtors may be

in the early stages of a repayment plan when they bring a complaint under § 523(a)(8).  It

follows that a debtor's evidentiary burden when trying to establish that IBRP debt forgiveness

will create an undue burden will often require proving what will occur in the distant future.  For

this reason, a number of courts have concluded that findings about these future events and

circumstances are inherently speculative.  *See, e.g., In re Bronsdon*, 421 B.R. at 35 (collecting

cases and determining that "predictions of tax liability at the conclusion of the ICRP period are

necessarily speculative")[18]; *see also Educ. Credit Mgmt. Corp. v. Jesperson*, 571 F.3d 775, 782

---

[18] The collected cases cited by the District Court in *Bronsdon* are:

> *Jones v. Bank One Texas*, 376 B.R. 130, 142 n.11 (W.D. Tex. 2007) (noting that "forecasting such tax liability under whatever tax laws will be in effect in 25 years is sheer speculation"); *Educ. Credit Mgmt. Corp. v. Stanley*, 300 B.R. 813, 818 n.8 (N.D. Fla. 2003) (same); *Paul v. Suffolk Univ. (In re Paul)*, 337 B.R. 730, 738 (Bankr. D. Mass. 2006) (holding that future tax liability is uncertain because, in 25 years, a debtor might pay off the debt or, if insolvent, might "enter into the offer in compromise program and reach a settlement agreement with the Internal Revenue Service"); *Archibald v. United Student Aid Funds, Inc. (In re Archibald)*, 280 B.R. 222, 229 (Bankr. S.D. Ind. 2002) (stating, in 2002, that "[t]he tax implications of a discharge under the ICRP are speculative at best given that the ICRP is approximately eight years old"). *But see, e.g., In re Durrani*, 311 B.R. 496, 508 (Bankr. N.D. Ill. 2004) ("However, that discharge of indebtedness, unlike a discharge in bankruptcy, results in income that [debtor] would have to recognize for taxable purposes."), *aff'd*, 320 B.R. 357 (N.D. Ill. 2005);

(8th Cir. 2009) (citing 26 U.S.C. § 108(a)(1)(B) and determining, under the totality of the

circumstances analysis, that "the court's reference to 'a potentially significant tax bill' when any

unpaid balance is cancelled after twenty-five years ignored the fact that cancellation results in

taxable income only if the borrower has assets exceeding the amount of debt being cancelled").  I

do not hold that this burden can *never* be met, but I agree with *Bronsdon* and its collected cases

that, in some instances depending on the record developed, the uncertainty of future events will

put the necessary findings beyond reach.  These matters will be more capable of proof, and taken

out of the realm of speculation, when debtors are older and closer to the end of their working

lives, or at least closer to the end of their IBRPs or other comparable plans.  One thing is clear,

however, even if speculative, some effort must be made to address the potential tax liability in

the evidentiary record.

    In this instance, the Debtor has not demonstrated that her IBRP will conclude in

forgiveness of debt that will result in a tax.  The Debtor has not offered evidence of the IBRP's

terms: its duration, when it commenced, how the monthly payment obligation is set and how

often it is reset, what she would project to be the remaining debt at its conclusion, and whether

she is likely to meet conditions for forgiveness of that debt.  She contends that a hardship would

be posed by taxation of the amount forgiven, but she has not cited or discussed the relevant

federal or state tax laws.  The evidence shows that the Debtor is presently insolvent, having

virtually no assets and a significant amount of student loan debt.  Even though I have found that

the Debtor will likely increase her earnings, she has not presented evidence that would allow me

---

*In re Korhonen*, 296 B.R. 492, 496–97 (Bankr. D. Minn. 2003) ("[T]he amount discharged
would be considered taxable income."); *In re Berscheid*, 309 B.R. 5, 14 (Bankr. D. Minn.
2002) ("Unless [debtor] significantly increases his income, he would go to his grave either
indebted to ECMC or, if not, indebted to the IRS on the tax obligation incurred when ECMC
forgives the unpaid loan.").

421 B.R. at  35–36.

to find that her solvency is likely to improve while she continues to pay off her debt over the

remaining term of the IBRP.  If her current state of almost complete insolvency were to continue

until the conclusion of her IBRP, the forgiveness of debt at that time would result in little or no

taxable income, at least for federal gross income tax calculations.  The Debtor has also not

developed any record as to why, if she were somehow to obtain appreciable solvency before the

end of her IBRP, that solvency would not enable her to pay a tax that results from forgiveness of

debt or at what point she would no longer qualify for participation in the IBRP or other income-

dependent program.  It is understandable that proof supporting any of these determinations

would be difficult given what could be a long horizon for these events to occur for this Debtor,

but, as previously stated, some effort must be made to address them.  In short, the Debtor's

evidence falls short of establishing by a preponderance of the evidence what amount of debt

forgiveness will occur, that any such forgiveness will result in tax liability, and that the resulting

tax liability will constitute an undue hardship.

Alternatively, the Debtor seeks a contingent, prospective, and partial discharge under §

523(a)(8).  It is prospective because, although it would enter now, it would be effective only in

the future, if and when the Debtor completed an IBRP and, under its terms, became entitled to

forgiveness of her remaining debt under the Ford Program.  The discharge would be effective

immediately before the debt forgiveness, so as to leave no debt to be forgiven under the loan

program.  Instead, the forgiveness of any future remaining balance would not be includable as

income because the discharge of the remaining balance would have occurred as a result of a

discharge determination in a bankruptcy, thereby averting the undue hardship that the debt

forgiveness would otherwise cause in the form of income tax on forgiveness of indebtedness

income.[19]  The discharge would be partial in that it would extend to only such debt as remained

at the time of the future discharge.  The discharge would be contingent in that it would become

effective only if the Debtor completed an IBRP and became entitled under its terms to

forgiveness of her balance.

As authority for this relief, the Debtor relies on two decisions from this District.  The first

is *In re Brunell*, in which the court did not find undue hardship and concluded that the debtor in

that case had "current income and expenses necessary to provide for herself and her children,

with some small adjustments to her expenses, demonstrat[ing] that she holds a surplus from

which a monthly payment toward her student loan obligations can be made[.]"  356 B.R. at 580.

The court went on to find that, "should something drastic happen in her circumstances[,]" an

income-dependent payment plan under the Ford Program would be an option and that if she

obtained a forgiveness of her debt under that program "the payment of tax on any gross income

imputed to the [d]ebtor, from any amount of student loan debt forgiven, would impose an undue

burden on the [d]ebtor, and hence be dischargeable."  *Id*.  In that case, the court acknowledged

the speculative nature of such a determination, but did not address future insolvency that could

impact the hardship of forgiveness income, stating: "to the extent that the [d]ebtor is obligated

under any tax liability as may exist under the tax laws in effect at that time, the presence of any

such liability at the end of one's working life would be a tremendous undue hardship incurred as

the result of the student loan."  *Id*. at 580–81.  The *Brunell* court did not consider the likelihood

of the debtor's insolvency upon future completion of an income-dependent repayment plan in

determining that a prospective discharge was appropriate in that case.  I am not able to similarly

---

[19]  Under § 108 of Title 26 of the United States Code, 26 U.S.C. §§ 1 *et seq.*, as amended (the "Internal Revenue Code"), no debt forgiveness income arises from a bankruptcy discharge of debt.  26 U.S.C. § 108(a)(1)(A) ("Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if--(A) the discharge occurs in a title 11 case[.]")).

conclude that participation in a IBRP will, itself, impose an undue hardship on the Debtor because of possible resulting forgiveness of indebtedness income if the plan is successfully concluded without further examination of the Debtor's projected financial situation at the conclusion of her IBRP. The Debtor did not present that type of evidence in this case.

The second case is *Ayele v. Educ. Credit Mgmt. Corp. (In re Ayele)*, 468 B.R. 24 (Bankr. D. Mass. 2012), *aff'd*, 490 B.R. 460 (D. Mass. 2013). In *Ayele*, the court found, in part on the basis of the debtor's ability to participate in an ICRP or similar program, that the debtor had not established a present undue hardship. 468 B.R. at 35. But, looking to § 105, the court fashioned equitable relief to prospectively discharge any student loan debt remaining at the conclusion of any ICRP the debtor might complete to allow him to avoid negative tax consequences.[20] *Id*. at 36. The court entered judgment in favor of the holder of the student loan debt "with the proviso that if [the debtor] inform[ed] the Court within 14 days of the date of [its] decision that he will participate in the Ford Program and, if he represents that he in good faith will abide by the provisions of the IBR program option or the ICR Plan option, then the Court shall enter a judgment partially discharging his student loan debt to the extent any remains at the expiration of the repayment plan." *Id*. As observed by the district court on appeal, the debtor declined to

---

[20] The court in *Ayele* cited to its prior decision in *Stevenson v. Educ. Credit Mgmt. Corp. (In re Stevenson)*, 463 B.R. 586 (Bankr. D. Mass. 2011), *aff'd*, 475 B.R. 286 (D. Mass. 2012), *aff'd*, 12-2015 (1st. Cir. July 22, 2013) in discussing application of a prospective discharge under § 105. In *Stevenson*, the court had found that, because of her eligibility to participate in an ICRP, the debtor had failed to prove that repayment of her student loan debt imposed an undue hardship, but concluded that the debtor's participation in an ICRP would, at its term, result in overwhelming income tax liability from debt forgiveness. *See id*. at 598. The court explained that it had "reservations about the prospective discharge of a potential tax liability" that had been employed in *In re Brunell* and "elect[ed] to take a slightly different route to achieve the type of equitable result espoused by the court in *Brunell*." *Id*. at 598. "[R]ather than enter an order discharging a potential contingent and unliquidated tax debt without notice to appropriate governmental authorities," the court determined to enter judgment denying immediate discharge of the student loan debt, but was willing to discharge any debt that remained upon the debtor's completion of an ICRP under § 105(a), provided the debtor informed the court that she would participate in an "Income Based Repayment Plan Option" under the Ford Program. *Id*. at 599. The court never amended the judgment to provide for partial prospective discharge because the debtor elected not to participate in an ICRP. Ord. [Dkt. No. 99, A.P. No. 08-1245-JNF, *Stevenson v. Educ. Credit Mgmt. Corp. (In re Stevenson)* (Bankr. D. Mass. Aug. 2, 2011)].

enter the program and the judgment that entered did not include a prospective partial discharge.
*See Ayele v. Educ. Credit Mgmt. Corp.*, 490 B.R. 460, 461 (D. Mass. 2013).

The partial nature of the discharge requested by the Debtor is not the impediment to the
alternative relief she is seeking. As several circuit courts of appeal have held, a bankruptcy court
may, in the exercise of its equitable powers under § 105(a), discharge student loan debt only in
part, provided that § 523(a)(8)'s requirement of undue hardship has been satisfied as to the
portion to be discharged. *See Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d
1200, 1207 (10th Cir. 2005) (recognizing a bankruptcy court cannot exercise its § 105(a) powers
to grant a partial discharge of student loans unless § 523(a)(8) has been satisfied); *Miller v. Pa.
Higher Educ. Assistance Agency (In re Miller)*, 377 F.3d 616, 622 (6th Cir. 2004) ("stress[ing]
that the requirement of undue hardship must always apply to the discharge of student loans in
bankruptcy—regardless of whether a court is discharging a debtor's student loans in full or only
partially"); *Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman)*, 325 F.3d 1168, 1173 (9th Cir.
2003) (determining that a bankruptcy court may exercise its equitable authority under 11 U.S.C.
§ 105(a) to partially discharge a student loan provided the portion being discharged satisfies §
523(a)(8)). As these cases make clear, even a partial discharge requires satisfaction of
§ 523(a)(8) as to the portion to be discharged. That is, a debtor must demonstrate that excepting
a specified portion of the debt from discharge would impose an undue hardship on the debtor and
her dependents. It is this obstacle that the Debtor has failed to clear.

Here, the Debtor argues that, unless the balance of her student loan debt is forgiven under
§ 523(a)(8) upon her completion of her IBRP, she will suffer undue hardship in the form of
overwhelming income tax debt that arises from forgiveness of debt income realized upon
completion of the plan. For the reasons stated above, the Debtor has not carried her burden of

creating a record about these potential financial and tax consequences in the distant future.[21]  No

less a showing is required where the discharge at issue is partial and prospective.  I may

speculate as to the future financial condition of the Debtor and potential tax consequences of

forgiveness of indebtedness after completion of an income-dependent repayment plan, but the

Debtor has not created a record that would support findings that I would be required to make to

grant a prospective discharge.

As I noted above, this is a very difficult burden for a debtor in her mid-forties,

presumably many years away from completion of a repayment program and the end of her

working life.  While I feel constrained by the legislative choices reflected in the applicable

statutes, it does not escape me that, although not meeting the statutory parameters of

demonstrating an undue hardship under § 523(a)(8), the financial burden of this educational debt

weighs on the Debtor and her family and that such burden remains as the Debtor completes a

repayment program and contemplates the potential consequences of forgiveness of that debt.

However, if participation and completion of an income-dependent plan under the Ford Program

is the only criteria for a prospective discharge because of a potential for forgiven amounts to be

taxed as income, then it would seem that all debtors who participate in an IBRP or other

comparable plan would be entitled to discharge such prospective amounts where there would be

little or negative amortization of the educational loan.  This result seems wholly inconsistent

with the statutory scheme meant to make discharge of student loan debt the exception rather than

the rule in order to preserve the viability of student loan programs.  In this case, the Debtor has

not introduced any evidence from which I can assess the likelihood of a tax upon forgiveness and

---

[21] *But see* Hunt, *supra* note 17, at 1347 (asserting that the "[t]he resource constraints of the typical student-loan
discharge proceeding and the inherent uncertainties of projecting solvency, loan balance, and tax rates up to twenty-
five years in the future may make [a] quantitative analysis … unworkable (at least in some cases)" and suggesting a
qualitative approach that posits that the speculative nature of the tax burden favors the debtor instead of the
creditor).

has not asserted that there will be other hardships that should be considered, such as the effect of

the looming debt or potential tax consequences of forgiveness on the debtor's health, family, and

financial circumstances, including any impairments or disincentives to accumulate retirement

savings, a home, or other assets that may be beyond the reach of creditors, but may be counted in

an insolvency analysis or be subject to levy by the taxing authorities.

Expanding on my earlier observations, this case illustrates the issues facing many debtors

with large student loan indebtedness.  Here, the Debtor is participating in an IBRP and paying

what she can towards her student loan balance.  Even if the Debtor increases her income,

additional expenses and adjusted student loan payments may not allow her to significantly

improve her financial condition or repay a material portion of her student loan debt.  It is likely

in that circumstance that the Debtor's indebtedness will increase substantially because payments

made by the Debtor will not cover accruing interest.  The Ford Program attempts to address this

potential consequence by providing forgiveness of the debt remaining at the end of a defined

repayment period.  While I agree with courts that have held that the availability of an IBRP is not

necessarily dispositive to the undue hardship analysis,[22] the reduced payments and the ultimate

forgiveness contemplated under the program may mean that a debtor may not suffer foreseeable

"undue hardship" that would support discharge of the student loan debt.  As in this case, it is the

possible future tax consequences of forgiveness of indebtedness at the conclusion of an income-

dependent repayment plan that may impose an undue hardship depending on a debtor's financial

situation at the time the student loan debt is forgiven.  Whether a debtor can introduce credible

---

[22] *See, e.g.*, *Fern v. Fedloan Servicing (In re Fern)*, 553 B.R. 362, 369 (Bankr. N.D. Iowa 2016), *aff'd*, 563 B.R. 1
(B.A.P. 8th Cir. 2017) (noting that "[e]ligibility for income-based repayment plans is one factor in [the totality-of-
the-circumstances] analysis" (quotations and citation omitted)); *In re Bronson*, 435 B.R. at 799 (determining that
the availability of a repayment plan under the Ford Program was a factor to be weighed by the court but was not
dispositive as to the issue of undue hardship); *In re Brooks*, 406 B.R. at 395 (concluding that "[e]ligibility for the
ICRP is not dispositive and must be considered in light of each individual debtor's unique situation").

evidence of those circumstances must be determined in each case, but assessing the basis for a

prospective undue hardship discharge where the forgiveness event is in the distant future

presents challenges for the evaluating court.

Given that § 108(a)(1) of the Internal Revenue Code does not exclude from gross income

indebtedness discharged after successful completion of an IBRP or other comparable repayment

plan under the Ford Program and elsewhere specifically provides that "all income from whatever

source derived, including . . . income from discharge of indebtedness" is included in the

definition of "gross income," *see* 26 U.S.C. § 61(a)(11),[23] I conclude that I must carefully

scrutinize the record to support any finding discharging student loan indebtedness because of

potential prospective tax liability, particularly where the Internal Revenue Code provides a

mechanism tied to insolvency to determine the relief that may be afforded to a taxpayer whose

debt is discharged after completion of an IBRP based on the taxpayer's financial circumstances

at the time of forgiveness, rather than at the time of a bankruptcy filing up to 25 years earlier.

Certainly, it would be easier to assess whether loan forgiveness would generate a tax burden the

closer a debtor is to the end of her working life or completion of an income-dependent plan.

Unfortunately for the Debtor, on this record at this time, I cannot grant the Debtor the fresh start

from her student loan obligations that she seeks.[24]

---

[23] Notably, a number of bills were introduced in the last session of Congress that would amend § 108(a)(1) of the Internal Revenue Code to exclude student loan indebtedness forgiven from gross income. *See* Student Loan Tax Relief Act, H.R. 1564, 117th Cong. (2021) (seeking to exclude from taxable income any student loan forgiveness or discharge); Student Loan Tax Relief Act, S.496, 117th Cong. (2021) (same); Students and Families Empowerment Act, H.R. 891, 117th Cong., § 3 (2021) (specifically addressing exclusion from gross income discharge of income contingent and income-based student loan indebtedness).

[24] A determination as to the nondischargeability of student loan obligations under § 523(a)(8) is not res judicata to a future determination brought under that subsection and the Debtor may seek a discharge of the student loan debt if her circumstances change. *See* 11 U.S.C. § 523(b); *see also Nash*, 446 F.3d at 194 (concluding "our decision today does not bar appellant from making another, more adequately supported request for discharge"); *In re Brunell*, 356 B.R. at 581 (citing to § 523(b) and stating that "should ECMC not approve her application for the Ford program or provide the Debtor an alternate affordable payment plan, or subject her wages or tax refunds to garnishment during the repayment period such that the Debtor is unable to subsist and care for her children, [the court] would consider

Congress has made legislative choices that create a substantial burden for a debtor in

these circumstances.[25]  While I am not without empathy for the struggle of the Debtor and Elena

to navigate their family life with the financial pressures of student loan debt, I must enter

judgment in favor of ECMC.

### b.  Request for a Declaration that No Income Tax Shall Arise from Forgiveness of Student Loan Debt

The Debtor requests a declaration against the Taxing Authorities that no income tax shall

arise from the discharge of student loan indebtedness that she has sought in the Second Amended

Complaint.  The Taxing Authorities seek dismissal on four grounds: (i) it is not sufficiently ripe

to present a justiciable controversy; (ii) this Court lacks subject matter jurisdiction over them;

(iii) the United States has not waived sovereign immunity as to the relief requested; and (iv) the

---

another request for discharge of the student loans and review of the Debtor's situation pursuant to the Debtor's properly renewed request at that time"); *Storey v. Nat'l Enter. Sys. (In re Storey)*, 312 B.R. 867, 875 (Bankr. N.D. Ohio 2004) (determining that a decision as to the nondischargeability of a student loan obligation is not res judicata pursuant to § 523(b) and noting that if the debtor's situation changed "for the worse, she is protected" by that subsection).

The Court takes no position at this time as to whether a case could be reopened for a debtor to seek a further determination of dischargeability or whether a future request must be sought in a new case. *Compare Sobh v. Empire of America (In re Sobh)*, 61 B.R. 576, 579 (E.D. Mich. 1986) (holding that "[w]hile § 523(b) allows for a redetermination of discharge in a subsequent petition for bankruptcy (so long as the discharge otherwise meets the requirements for discharge under § 523(a)), it does not foreclose redeterminations under the same petition"); *In re Walker*, 427 B.R. 471, 478 (B.A.P. 8th Cir. 2010), *aff'd*, 650 F.3d 1227 (8th Cir. 2011) (finding "no Rule or Code-based time limitation at all as to when a bankruptcy court may adjudicate the dischargeability of student loans") *with Zygarewicz v. Educ. Credit Mgmt. Corp. (In re Zygarewicz)*, 423 B.R. 909, 913 (Bankr. E.D. Cal. 2010) ("While a debtor's decision to file an action to determine the dischargeability of a student loan is not temporally constrained, this does not mean that a debtor's financial hardship may arise after a discharge has been entered … If a discharged debtor suffers later financial misfortune, that debtor must consider seeking another discharge subject to the limitations imposed by 11 U.S.C. §§ 727(a)(8) and 1328(f)."); *In re Kapsin*, 265 B.R. 778, 781 (Bankr. N.D. Ohio 2001) (denying motion to reopen case to determine dischargeability of student loan because "if a change of circumstances were, standing alone, sufficient to reopen a case for the sole purpose of discharging a student loan obligation, then any debtor who filed for bankruptcy relief could at any time—say even ten or twenty years later— invoke the jurisdiction of this Court for solely that purpose. This, of course, would create the anomalous situation of a perpetual Chapter 7 case, and thus would render superfluous, for purposes of a student loan obligation, paragraph (a) of § 350").

[25] *See, e.g., Nash*, 446 F.3d at 191 (stating that a debtor "has a formidable task, for Congress has made the judgment that the general purpose of the Bankruptcy Code to give honest debtors a fresh start does not automatically apply to student loan debtors. Rather, the interest in ensuring the continued viability of the student loan program takes precedence") (citation omitted)).

Anti-Injunction Act, 26 U.S.C. § 7421(a), precludes the relief requested.  In view of my

determination that the Debtor has not established entitlement to the discharge of her student debt

at this time or prospectively, her request for declaratory judgment is moot and shall accordingly

be dismissed.  The pending motion to dismiss of the United States, the subject of which is the

relief requested for declaratory judgment in the Second Amended Complaint, is likewise moot.

## V.    CONCLUSION

For the reasons set forth above, the Court will enter judgment in favor of ECMC and

against the Debtor.  The Court will also enter an order dismissing the Debtor's request for

declaratory relief against the Taxing Authorities as moot.


Date: March 20, 2023

_____
Christopher J. Panos
United States Bankruptcy Judge